IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

SEPTEMBER 1996 SESSION

FILED

June 20, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| WAYNE LEE BATES, | * | |
| | * | C.C.A. NO. 01C01-9603-CC-00102 |
| Appellant, | * | |
| | * | COFFEE COUNTY |
| VS. | * | |
| | * | Hon. Gerald L. Ewell, Judge |
| STATE OF TENNESSEE, | * | |
| | * | (Post-Conviction) |
| Appellee. | * | |

For Appellant:

William M. Leach, Jr.
Waller, Lansden, Dortch & Davis
Nashville City Center
511 Union Street, Suite 2100
Nashville, TN 37219-1760

Paul J. Morrow, Jr.
Attorney at Law
1505 Compton Avenue
Nashville, TN 37210
(at post-conviction hearing only)

For Appellee:

Charles W. Burson
Attorney General and Reporter
450 James Robertson Parkway
Nashville, TN 37243-0493

John P. Cauley
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

Glenn R. Pruden
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493
(at post-conviction hearing only)

Charles M. Layne
District Attorney General
307 S. Woodland
P.O. Box 147
Manchester, TN 37355

Kenneth W. Shelton, Jr.
Assistant District Attorney General
P.O. Box 147
Manchester, TN 37355

OPINION FILED:_____

AFFIRMED

GARY R. WADE, JUDGE

**OPINION**

1

The petitioner, Wayne Lee Bates, appeals the trial court's denial of post-conviction relief on a conviction of first degree murder. His sentence was death by electrocution. The petitioner presents the following issues for our review:

> (1)    whether his guilty plea was knowingly and voluntarily entered;
>
> (2)    whether he received the effective assistance of counsel; and
>
> (3)    whether the polygraph examination of Marvin Littleton qualifies as Brady material. See Brady v. Maryland, 373 U.S. 83 (1963).

We find no error and affirm the judgment of the trial court.

## Background

On June 4, 1986, the petitioner was arrested in Allen County, Kentucky, after having stolen an automobile in Nashville, Tennessee. He was transferred to the Allen County Jail in Scottsville, Kentucky, where he was charged with other offenses. On July 20 of the same year, while the petitioner was attending a church service at the courthouse, he escaped from custody and traveled by various means to Franklin, Kentucky. In Franklin, he broke into a residence and stole, among other things, clothing and a .410-gauge shotgun. The petitioner sawed off the barrel and the stock of the shotgun. He then traveled to Manchester, Tennessee, arriving in the early morning hours of July 23.

Meanwhile, Julia Guida, an engineer with Hercules Corporation in Salt Lake City, Utah, flew to Nashville on a business trip, rented a 1986 Mercury from a Hertz rental agency, and drove to Manchester where she checked into a Holiday Inn. On the morning of July 23, she went jogging, carrying a Walkman radio with headphones and her motel and car keys. The petitioner, while pointing the shotgun,

2

approached her.  After a struggle, the petitioner forced the victim across an open field into a wooded area and tied her to a small tree.  He used the shoestrings from her jogging shoes and the headphone cord from the Walkman radio to bind her and gagged her with her socks.  After assuring her that he was leaving to retrieve her car, the petitioner shot the victim in the back of the head, killing her instantly.  The petitioner then untied the victim and covered her body with tree limbs and branches.  He buried the Walkman radio at one location and the stock of the sawed-off shotgun at another.  Before leaving the scene, he scattered other items, including her tennis shoes, her socks, and his shotgun shells and suitcase.

Afterwards, the petitioner went to the victim's room at the Holiday Inn, showered, shaved, ate some fruit, and took a nap.  At approximately 2:00 that afternoon, the petitioner found the victim's rental car and some traveler's checks and drove to Bristol by way of Chattanooga and Knoxville.  He picked up two hitchhikers, Francine Kelman and Marvin Littleton, along I-81 in Bristol.  Kelman forged and passed some of the traveler's checks at various places en route to Baltimore, Maryland.  The three arrived at their destination on the morning of July 24 and rented a room in a downtown motel.

During the early morning hours of July 26, the petitioner, who had become intoxicated while partying with friends and relatives, was stopped by a Baltimore police officer.  When the petitioner, driving the stolen vehicle, attempted to drive away, the officer pursued.  The petitioner wrecked the car and then attempted to flee on foot; he was eventually caught, arrested for DUI, and charged with leaving the scene.  The car was impounded.

3

The petitioner was interviewed on August 20 by FBI agents for interstate transportation of a stolen vehicle and the possible kidnapping of the victim. When the petitioner told agents that he needed a lawyer, the interrogation ceased. No attorney was provided over the next thirteen days.

The investigation of the victim's disappearance led Tennessee authorities to Maryland. On September 2, Tennessee authorities arrived in Baltimore to investigate the kidnapping and possible murder of the victim. Although they were informed by the FBI of his request for an attorney, the Tennessee authorities advised the petitioner of his rights, which he acknowledged, and sought a statement. The petitioner was not given a written waiver to sign. After learning in a telephone conversation that his brother had no interest in visiting him at the jail, the petitioner confessed to the murder and drew a map to the location of the body. The skeletal remains of the victim were found the next day. The Walkman radio, her tennis shoes, two shotgun shells, and a .410 shotgun were found nearby.

A second statement was given to the FBI on September 11. Although the petitioner still had no attorney, he gave a statement identical to his earlier admissions. After the petitioner was transported to Tennessee, he confessed to the murder to a fellow inmate in the Coffee County Jail.

The defendant pled guilty to first degree murder and grand larceny. During the penalty phase of the trial, the state introduced proof of a 1977 conviction for robbery with a dangerous and deadly weapon, a 1982 conviction for assault and battery upon a Department of Correction employee, and a 1980 conviction for felony escape. Helen Bates, the petitioner's mother, testified that her son was born prematurely in 1958 and was the oldest of her four children. She claimed that the

4

petitioner was not fully developed in his left lung or his bowels at the time of his birth. She described how the petitioner, until age ten or eleven, would rock back and forth as hard as he could whenever he was put to bed. She recalled that the petitioner usually had worn himself out by the time he went to sleep. She remembered that the petitioner seemed to resent a younger brother, twenty-two months younger, with whom he would constantly fight.

Ms. Bates recalled that when the petitioner was three years old, his father retired from the Navy and the family moved to Lemont, Illinois. The petitioner continued to be a problem and did not get along with other neighborhood children. The neighbors would not let the petitioner come near their children. During this period, the petitioner's father physically abused his mother in front of their children on a regular basis. She remembered that on one occasion, when she threatened to leave, the petitioner's father secluded himself with the petitioner's sister, still an infant, and played Russian roulette.

Ms. Bates testified that the petitioner was in the home when she shot his father four times; afterward, his father spent six to eight weeks in the hospital in recovery. She claimed that later, he committed suicide by an overdose of medication. Ms. Bates recalled trying to kill herself with sleeping pills; she was hospitalized for six weeks. During that time, her children stayed with her mother in Baltimore. She recalled that the petitioner's behavior continued to worsen. After a couple of years, the family moved to downtown Baltimore near the housing projects; Ms. Bates claimed that it was because the petitioner was having trouble with the neighbors. Ms. Bates acknowledged that during this period, she lived with a man who had been convicted of armed robbery. She belonged to a motorcycle gang at the time and other members of the group were in her home on a regular basis. She

5

testified that she got drunk just about every weekend and recalled that the man she was residing with was often under the influence of drugs while in her home. Later, she married another man who had also been convicted of armed robbery; he had mental problems and frequently tried to kill himself. Eventually, this husband was wounded by a police bullet in front of the house and was subsequently confined to a mental hospital for seven months; she later divorced him. Ms. Bates testified that while living in Baltimore, she moved her family six to seven times before petitioner reached eighteen years of age.

Report cards established that the petitioner did not do well in school, missed a lot of school, which Ms. Bates attributed to illness, and had problems socially. In the third grade, the petitioner falsely set off a fire alarm and was assigned a probation officer. He repeated third grade but was taken out of school for burglarizing and vandalizing the school. By the age of nine, he was turned over to juvenile authorities for evaluation. At eleven years of age, the petitioner was committed to a juvenile institution and was in and out thereafter until he reached the age of majority. Shortly thereafter, the petitioner began a term in prison that lasted almost ten years.

Dr. John Griffin, a Nashville psychiatrist, also testified on behalf of the petitioner at the sentencing hearing. He had reviewed numerous personal records on the petitioner, met with him on three occasions, and had talked with him by telephone. Dr. Griffin related to the jury the life history of the petitioner as documented through treatment. He found that the petitioner's early life included depression and hyper-kinetic or minimal brain dysfunction. It was his opinion that as the petitioner got older, he developed a mixed personality disorder. Dr. Griffin testified that these three mental defects impaired the petitioner's capacity to conform

6

his conduct to the law; he contended that the impairment was related to a mental disease or defect.

The Tennessee Department of Mental Health determined that the petitioner had mixed substance abuse and an anti-social personality disorder. Dr. Griffin found that the petitioner had a mixed personality disorder which included anti-social characteristics; he also found paranoia and significant depression. Dr. Griffin testified that the petitioner's mood changed frequently and that he cried, felt hopeless at times, and had nightmares. The petitioner occasionally refused to sleep and had an appetite disorder; a stab wound was a continuous source of pain. In Dr. Griffin's opinion, the petitioner had a very unusual background, highlighted by neglect and violence over many years, including his time in prison. Although he could not document neurologic impairment, Dr. Griffin testified that the petitioner had subtle signs of brain damage.

At the conclusion of the hearing, the petitioner received the death penalty. The jury found three aggravating circumstances: (1) that the petitioner had been previously convicted of a felony involving violence; (2) that the petitioner committed the murder for the purpose of avoiding or preventing his lawful arrest and prosecution; and (3) that the murder was committed while the defendant was engaged in committing robbery, larceny, or kidnapping. See Tenn. Code Ann. § 39-2-203(i)(2), (6), (7) (repealed 1989).

**Post-Conviction Hearing**

On January 7, 1992, the petitioner filed this petition for post-conviction relief. Eight months later, the petitioner filed a pro se letter requesting that his attorney, Paul Morrow of the Capital Case Resource Center, be discharged and he

be allowed to represent himself. The petitioner also requested to dismiss his petition and to schedule an execution date. On September 18, 1992, the petitioner filed a pro se letter requesting that the first letter be disregarded. Five months later, the petitioner sent a letter to the assistant district attorney indicating that he had been "conned" by his attorneys into withdrawing his request for execution and wanted to dismiss his case. On August 31, 1993, the petitioner filed a pro se motion requesting that his counsel be relieved of their duties and that his post-conviction petition be withdrawn; six weeks later, he filed another pro se motion to dismiss his post-conviction petition. After a hearing on the matter, the trial court dismissed counsel, dismissed the petitioner's post-conviction petition, and set an execution date.

An appeal by his counsel to the supreme court resulted in the appointment of William M. Leach, Jr., as attorney ad litem. His primary obligation was to determine whether the petitioner was competent to dismiss his attorney. After the matter was briefed and argued, our supreme court remanded the matter for a hearing on whether the petitioner was competent to discharge his attorney. In early 1994, an agreed order was filed reinstating the post-conviction petition and appointing Attorney Leach as counsel.

At the evidentiary hearing, Dr. Pamela Auble, a psychologist with a speciality in clinical psychology and neuropsychology, testified that she had reviewed an extensive list of the petitioner's medical, criminal, and juvenile records, the psychiatric records of his mother, and the trial testimony of Dr. Griffin and Dr. Marshall. She described neuropsychology as involving the evaluation of a patient to determine whether brain damage or dysfunction may be present and how that affects the individual. Dr. Auble interviewed the petitioner and administered several

8

neuropsychological tests designed to examine the mental functioning of the petitioner. Because she found that the records include numerous references to the possibility of impairment, Dr. Auble testified that neurological testing should have been done before trial. She found evidence of brain dysfunction in several different areas.

Dr. Auble testified that the petitioner had difficulty reasoning and switching between different ideas when confronted with unfamiliar and complex situations. She also found that the petitioner had trouble picking out important details and that his performance was impaired in those situations. It was her opinion that the petitioner's condition limited his range of options under the circumstances of the murder. She believed that the petitioner was impaired in terms of speed and dexterity in his left hand, which is controlled by the right front part of his brain; she explained that this part of the brain is also associated with the ability to exercise emotional control and to understand other people. Dr. Auble testified that the dysfunctional left hand indicated such limitations. It was her view that the petitioner had the emotional controls of a two-year-old.

Dr. Auble testified that the petitioner had a diminished capacity at the time of the murder because of sleep deprivation, his inability to control his emotions, and his chronic pain due to an old stab wound to his back; if petitioner had consumed intoxicants, that would have qualified as further impairment. Dr. Auble described the petitioner's brain damage as having been caused by his premature birth or his mother's alcohol consumption during pregnancy. She found evidence of inadequate development of some of his organ systems and possible inadequacies in brain development. Dr. Auble stated that records indicated that the petitioner suffered a variety of head injuries and had a chaotic home life; she believed that

9

extended periods of segregation while in prison also might have had a negative effect on the petitioner's ability to relate to others. From all of this, Dr. Auble concluded that the petitioner lacked the ability to conform his actions. She described his degree of emotional control as limited to nonexistent.

Dr. Theodore H. Blau, a clinical psychologist and neuropsychologist from Tampa, Florida, testified for the state. He reviewed the petitioner's records and examinations, conducted a partial examination on the petitioner, and relied upon neuropsychological tests administered by Dr. Auble. Dr. Blau reached four major conclusions: first, he found no evidence that the petitioner was either insane or incompetent to stand trial; second, he found no indication that the petitioner was under the influence of extreme mental or emotional distress at the time of the murder; third, he found no indication that the petitioner had been substantially impaired as a result of either mental disease, defects, or intoxication; and fourth, he determined that at the time of his examination on April 27, 1995, there was no indication that the petitioner was unable to participate in the post-conviction proceeding.

Dr. Blau compared the petitioner's various test scores with normative data on incarcerated male felons between the ages of thirty to thirty-nine. He determined that the petitioner's intelligence was average in comparison. He also found that the petitioner had the ability to separate essential from nonessential detail and could understand and empathize with others.

The petitioner was represented at trial by Roger J. Bean of Manchester, Tennessee, and Robert S. Peters of Tullahoma, Tennessee. Attorney Bean, who appeared on behalf of the petitioner at the post-conviction hearing,

testified that he was in charge of gathering the petitioner's records and that Attorney Peters was to maintain the records and prepare Dr. Griffin's testimony. Attorney Bean acknowledged that some of the petitioner's records would be damaging if revealed to a jury and that counsel relied upon Dr. Griffin to gather the important facts necessary to substantiate his opinion of the petitioner.

Attorney Bean recalled discussing with the petitioner on several occasions the possibility of entering a guilty plea. When a motion to suppress the confessions was overruled, he recalled telling the petitioner that he felt a guilty plea was in the petitioner's best interest. Attorney Bean had no recollection of telling petitioner that he could prevent the confessions from being introduced during the sentencing phase of the trial. He also testified to advising the petitioner that counsel would attempt to preserve the suppression issue for appellate review. He recalled that the petitioner was reluctant to plead guilty at first, but agreed to do so based primarily on counsel's recommendation.

Attorney Bean also testified that counsel recommended the guilty plea in an effort to minimize the evidence against petitioner and, in an effort to save his life, to focus on the mitigating circumstances. The petitioner discussed this option with his attorneys on many occasions. Attorney Bean, conceding his belief that the defense had the burden of proving the mitigating circumstances, testified that their guilty plea strategy was their best chance to avoid the death penalty.

Attorney Bean, who acknowledged that the petitioner wavered on whether to testify, recommended that he not do so. During a recess in the trial, the issue was discussed at length in a holding cell before the final decision was made. At that point, the petitioner agreed that it was not in his best interest to testify.

11

Attorney Bean testified that he feared the petitioner, if called to testify, could not control his temper. He also believed that the state would cross-examine the petitioner about events during his prior incarceration, which was potentially dangerous.

The district attorney had maintained an "open file" policy prior to trial. For that reason, Attorney Bean did not request <u>Jencks</u> material after each witness. He did recall receiving a copy of the FBI interview sheet on Littleton and Kelman (the hitchhikers); he did not, however, remember receiving any information on Littleton's polygraph examination. Attorney Bean testified that he had no indication from any source that Kelman or Littleton were involved in the murder. He recalled his failure to object to the introduction of a prior conviction as a mistake but noted that the issue was unsuccessfully raised on appeal.

Attorney Peters, called as a state witness, testified that he had met with the petitioner on many occasions. He remembered several conversations with the petitioner about the possibility of a guilty plea. He claimed counsel performed a careful background check which included a trip to West Virginia, to see the petitioner's mother, and to Maryland, where he toured the maximum security penitentiary in Baltimore. Peters testified that he and Attorney Bean also talked to relatives and acquaintances of the petitioner. It was Attorney Peters's conclusion that a first degree murder conviction was inevitable. He believed that the guilty plea preserved credibility and maximized the opportunity to voir dire potential jurors.

Attorney Peters confirmed that the petitioner participated in the development of trial strategy, fully cooperated with the investigation, and made no objections to their course of action. He acknowledged that the petitioner was fully

aware of the ramifications of his guilty plea. Attorney Peters specifically remembered the petitioner saying that he understood the consequences of the plea; he believed that the decision to plead guilty was independent of any issues surrounding the admissibility of the confession.

Attorney Peters testified that he never represented to the petitioner that the confession would not be evidence at the sentencing hearing. He wanted to enter the guilty plea and reserve the confession issue as a basis for appeal in the event the jury returned a death verdict. Attorney Peters conceded that it was arguable as to whether counsel would be successful in preserving appellate review, but thought it was worth the risk. Attorney Peters testified that he explained to the petitioner that the plea would bar his right to appeal the issue of guilt. He described the agreed strategy to be that if the motion to suppress would be overruled, the case would proceed to the penalty phase; if the death penalty were imposed, the defense would appeal on the suppression issue.

Attorney Peters testified that even if the prosecution had not agreed to reserve the suppression issue, the defense would have gone ahead with the guilty plea despite the fact that the trial court had initially expressed reservations about the admissibility of the confession. Attorney Peters conceded that there was confusion at the time the guilty plea was entered. He testified that he may have caused the confusion by his attempt to reserve the suppression issue for appellate review. Attorney Peters also recalled that the petitioner never expressed a desire to testify. He thought his testimony would be harmful to the defense.

Attorney Peters testified that he could not remember why all of the petitioner's prior records were not offered as evidence at trial. He was uncertain

13

whether it was an oversight or whether the matters had been fully presented through other testimony. Attorney Peters acknowledged that the petitioner had an abnormality which could possibly have been a type of brain syndrome. He conceded that more access to an expert might have been helpful. He described as the main problem a lack of resources for a more complete background summary and physiological makeup report. Attorney Peters acknowledged that the defense did not object to some demeaning comments by the prosecutor. He explained that their strategy was to establish rapport with the jury by lodging objections only to clearly impermissible commentary.

The petitioner testified that Attorney Peters told him that a guilty plea would preclude the state from introducing the confession as evidence during the penalty phase. The petitioner conceded that he told counsel, "Whatever you guys want to do is all right with me. You guys are running the show." He recalled signing a plea agreement which purportedly reserved the right to appeal the confession. The petitioner remembered that there was an argument about the plea agreement document and that it was changed, but that he did not understand what had been done. He denied signing a revised agreement.

The petitioner claimed that he was unaware that a guilty plea was a waiver of the confession issue. His recollection was that his attorneys believed that the penalty phase would be limited to only the mitigating and aggravating circumstances; had he known otherwise, he would not have pled guilty. The petitioner claimed that he pled guilty based on the strategy and advice of counsel. While recognizing that his defense counsel advised him not to testify because they feared he would get angry, the petitioner also claimed that he wanted to testify at trial. He testified that Attorney Bean appeared to be intimidated by his presence.

14

He acknowledged that he had pled guilty once before in Maryland; the petitioner contended that he was coerced into that guilty plea because prison officials took him off his medications two weeks before trial.

Ross Alderman, Deputy Public Defender for Davidson County, testified on behalf of the petitioner as a legal expert. It was his opinion that defense counsel was ineffective based on the cumulative nature of their errors. First, Attorney Alderman testified that counsel should never have expressed their belief to the trial judge that the suppression motion would be denied. Secondly, he testified that he did not believe the law allowed for a guilty plea and the preservation of the confession issue as to the guilt phase of the trial. Thirdly, he asserted that the transcript indicated much confusion surrounding the suppression issue. Attorney Alderman also testified that the defense got no tactical advantage by the guilty plea.

Furthermore, it was his belief that defense counsel misunderstood the burden of proof as to mitigating circumstances. Attorney Alderman contended that the defense should have objected to the district attorney's allegation of lack of remorse because it was irrelevant and might have qualified as a comment upon his right not to testify. He also believed that the petitioner's prior records supporting Dr. Griffin's conclusions should have been introduced into evidence. He contended that the records revealed possible witnesses who could have discussed specific instances regarding the petitioner's development at various stages of his life. Attorney Alderman testified that it was also a mistake to stipulate the petitioner's prior convictions and asserted that the petitioner should have been allowed to testify; it was his opinion that a jury was less likely to execute when they knew as much as possible about his life circumstances.

I

The petitioner argues that his plea was neither knowingly nor voluntarily made because neither the trial court nor his trial counsel explained the consequences that a guilty plea would have on his ability to appeal the admissibility of his prior confessions at the sentencing stage of the trial. He claims that, in consequence, he did not fully understand what he was giving up by pleading guilty. More specifically, the petitioner submits that he would not have pled guilty if he had known that his prior confessions would be entered into evidence in the penalty phase. He complains that he was further confused when there was a change in the proposed plea agreement, and that neither his counsel nor the trial court explained this change.

In response, the state submits that the evidence clearly shows that every precaution was taken to ensure the petitioner understood the consequences of his plea. The state also points out that the petitioner did in fact obtain appellate review on the admissibility of the confession, not only as to the sentencing portion of the proceeding but also had there been a guilt phase of the trial.

In Boykin v. Alabama, 395 U.S. 238 (1969), the United States Supreme Court established that the admonition of certain rights are required by the Constitution. Included among these entitlements are the right against self-incrimination, the right to confront witnesses, and the right to a trial by jury. Id. at 243. The relinquishment of those rights cannot be presumed from a silent record. Id.; see State v. Mackey, 553 S.W.2d 337, 341-42 (Tenn.1977). Our supreme court has established guidelines for the review of guilty pleas. State v. Neal, 810 S.W.2d 131 (Tenn.1991) overruled in part by Blankenship v. State, 858 S.W.2d 897 (Tenn. 1993). While the overriding determination of the validity of the guilty plea rests upon whether it was knowingly and voluntarily entered, proof of the failure to warn of a

16

recognized right shifts the burden of proof to the state. If the trial court substantially

complies with the litany of constitutional rights mandated, there is no error. In

Johnson v. State, 834 S.W.2d 922 (Tenn.1992), our supreme court held as follows:

> [I]f the transcript shows that the petitioner was aware of
> his constitutional rights, he is not entitled to relief on the
> ground that the mandated advice was not given. Also, if
> all the proof presented at the post-conviction hearing,
> including the transcript of the guilty plea hearing, shows
> that the petitioner was aware of his constitutional rights,
> he is not entitled to relief.

Id. at 926. In those instances of non-compliance, the error may be harmless when

the state meets its burden of showing that the pleas were knowing and voluntary.

The petitioner's age, level of education, intelligence, experience, general

understanding of constitutional rights, desire to avoid a greater penalty, and

representation by competent counsel at the submission hearing are all factors which

might be appropriately taken into consideration. See Blankenship v. State, 858

S.W.2d 897, 904 (Tenn. 1993); State v. Richard Lee Sheckles, No. 1 (Tenn. Crim.

App., at Jackson, November 21, 1990).


In Neal, the Tennessee Supreme Court articulated the difference

between "substantial compliance" and "harmless error" analysis as follows:

> While we have alluded to review of Boykin
> violations as being "subject to substantial compliance
> and harmless error scrutiny" in State v. Frazier, [784
> S.W.2d 927 (Tenn.1990)], we did not mean to adopt a
> substantial compliance doctrine that would be anything
> less than full compliance with the heretofore set out
> requirements. While absolutely literal compliance with
> the advice to be given is not required, expressing the
> sense of the substance of the required advice to a
> guilty-pleading defendant is. That would be substantial
> compliance.

810 S.W.2d at 137. Substantial compliance is not error. Where there is substantial

compliance the root purpose of the prescribed litany has been served and the guilty

plea passes due process scrutiny because it was made voluntarily and

understandingly.  In the context of patent omissions from the advice litany, the test is whether the error was harmless.  State v. Newsome, 778 S.W.2d 34, 38 (Tenn.1989).

In our view, the record supports the conclusion that the petitioner knowingly and voluntarily waived the rights guaranteed under Boykin.  Moreover, the record supports the finding that the petitioner understood that he was waiving the right to appeal the  denial of the suppression motion as it related to the guilt-innocence phase.

A review of the plea proceedings demonstrates this.  On April 28, 1987, an in camera hearing was held.  At the hearing, the following colloquy occurred:

| | |
|---|---|
| MR. RAMSEY: | Mr. Peters, who is lead counsel in this case as I understand it, approached me this morning and advised that they had discussed the possibility of entering a plea of guilty to the indictment in this case with their client, Mr. Bates.  They advised that is what they were going to do, subject to their right to appeal a Rule 11 motion on the confession issue-- |
| THE COURT: | --That may not be necessary, but we will just have to wait and see. |
| MR. RAMSEY: | In further discussion, Mr. Peters said what they anticipated was the Court would, as the record stands now, overrule the Motion to Suppress; and only if the death penalty was imposed, obviously, they would reserve their right to a Rule 11 appeal as the record stands now. |

18

| | |
|---|---|
| THE COURT: | The record will show that I have not ruled on the Motion to Suppress. |
| MR. RAMSEY: | The agreement is that the Court overrule the Motion to Suppress to get the record in shape. |
| MR. PETERS: | That's correct, preserving our right to appeal. We will only appeal in the event that the death penalty is imposed. |
| THE COURT: | I have some very serious reservations about the admissibility of that .... Are you saying that there will be an agreement that the Court will overrule it? |
| MR. RAMSEY: | Yes, sir. |
| MR. PETERS: | This creates a problem .... We would have no problem insofar as the guilt phase is involved. I take it in this case the Attorney General will likely propose to introduce into evidence the confessions at the penalty phase. If the Court's ruling is such--this will change matters. If the Court rules in that way, then it is likely, if our client does not take the stand in the penalty phase, those statements will likewise be inadmissible in that stage also, which would alter the effect of the Court's ruling. Obviously, preserving our objection to the admissibility of those statements in the guilt phase, when we have already pled guilty, could only inure to our benefit; but it would inure to our detriment if the Court so ruled regarding the penalty phase. Is that not correct? |
| THE COURT: | I am reviewing the testimony of the suppression hearing.... At this point, I have some |

19

very, very serious reservations that any statements made by Bates in Baltimore are admissible, after his announcement to the FBI whereupon they terminated the interview, and six and a half hours of interviewing by Wix and Floied. The FBI said they told Wix about it, and Wix admits it, that Bates demanded an attorney. It's a problem, gentlemen.

MR. PETERS:      Your Honor, the point is, obviously, we could only agree that that would be overruled in the event it would involve the guilt phase. Obviously, if the Court is going to rule that way, we are still going to enter a plea--

THE COURT:      --I'm not saying in which way I am going to rule. I am not at the end of the testimony yet. I am saying I have some very, very serious problems with it. The word I got this morning is that you were going to enter a plea.

MR. PETERS:      That's right.

THE COURT:      I anticipated that you might enter the plea and reserve the right to raise the question of the statements on appeal.

MR. PETERS:      Right. If the death penalty was imposed, we would raise that issue. If the Attorney General intends to introduce these statements at the penalty phase and the Court ruled them inadmissible, they would only become admissible if our client took the stand. Isn't that correct?

THE COURT:      You all have involved me in something at this point that I

20

do not want to be involved in ....

MR. RAMSEY: --I understand. I apologize to the Court. I thought we had an understanding.

THE COURT: We had a further hearing set on the Motion to Suppress the Statements and the Videotape. As far as I am concerned, we will recess this matter. We will pursue that when we get to it in open court. Whatever happens will happen. If you are going to reserve a right to appeal the question of the admissibility of the statements, I want to have some intelligent input into the ruling. I think it is my obligation to, and not to go along with an agreement on it.

MR. PETERS: I understand. Obviously, if we enter a plea of guilty, we won't have any guilt phase of the trial. Therefore, the purpose of reserving that objection would be at that point. However, the penalty phase could involve some of the same kind of evidence; and we cannot make that concession at that point.

THE COURT: I'm not involved in it. I do not think I should be. At this point, we will go ahead and have the hearing. Whatever you gentlemen decide to do, I will address it as I should in due course in open court.

MR. RAMSEY: I don't want to belabor the point, but the State cannot control the decision the defendant wants to make--

THE COURT: --Nor can the Court, and I don't intend to. I am uncomfortable in this position now. I don't think I ought to be involved in it. I am

21

divorcing myself from it entirely. If you gentlemen want to talk and he comes up with a plea, that's fine. If you want me to go ahead and rule on the admissibility of the statements, that's fine. I will do that. I will do whatever has to be done in due course. Have whatever dialogue you want to about it between yourselves, but I am not going to involve myself in the plea bargain process or in any other aspect of it, except taking a plea or making a ruling.

MR. RAMSEY: Can we go one step further and ask the indulgence of the Court for advice? Assume that a plea is entered. We need to consider when it is to be entered because of the potential for pre-trial publicity that might adversely affect the jury venire. Assuming that a plea is entered, how are we going to handle that?

THE COURT: I really do not see that it makes any difference whether he pleads guilty now, or tomorrow, or after we impanel the jury. As far as I am concerned, counsel may very well want to tell the jury, in voir diring them, "Folks, you are not going to have to be concerned with guilt or innocence. You are only going to be considering the penalty." I don't see that it matters whether we take the plea now or closer to the trial or whatever. I dare say that defense counsel will be voir diring the jury on that and might say,"This man has entered a guilty plea." Whether they know it from them or the newspapers, what difference does it make? That's for them to decide.

22

MR. PETERS:     The only problem I had with it was the prejudicial effect.

THE COURT:      If you think it will have a prejudicial effect, you all can work it out if you want to in any way that suits you. Again, I don't think I should have any input into this matter.

Three days after their in camera discussion, the trial court overruled the motion to suppress. Four days after the ruling, the petitioner changed his plea to guilty. Attorney Peters announced that the defense intended to reserve the right to appeal the denial of the suppression motion even though he acknowledged that the issue was not dispositive of the case. When the trial court inquired as to the rationale, the following exchange occurred:

MR. PETERS:     There are two reasons. The Attorney General is going to introduce this confession at the sentencing phase. We want to make clear by our plea of guilty that we are not waiving our objection; and obviously, we would have an automatic appeal. That confession, although not necessarily dispositive, can have a materially adverse effect in the jury's decision of whether or not to impose the death penalty.

THE COURT:      You are referring to the sentencing phase?

MR. PETERS:     Yes, sir. If this is not adjudicated, my client would be highly prejudiced if we did not enter this caveat in the record.

THE COURT:      Mr. Bean, do you concur in this motion?

MR. BEAN:       Yes, Your Honor.

23

THE COURT:     Tell me on the record how much time you have spent with your client discussing this aspect and what you have told him in relation to a plea of guilty to murder in the first degree, and the explanation you have given him concerning the constitutional rights that he has and waives by entering such a plea, and the elements of the offense, and the punishment possible.

MR. PETERS:     This conference has been going on for some period of time.  It was not a sudden decision.  It has taken place over a period of time.  I believe Mr. Bean understands the chronology better than I do.  It is not the result of just one discussion; it is the result of numerous discussions.

THE COURT:     You indicated to me last week that prior to that time, which was on the record in camera, that the matter had been discussed with Mr. Bates at that time.

MR. PETERS:     That's correct.  I will defer to Mr. Bean.  We have been present together, and he [was] alone with Mr. Bates on one or more than one occasion when this has been discussed.  It has been discussed on several occasions.  It was most recently discussed at some length last night.

MR. BEAN:     Of course, we have conferred with Mr. Bates on numerous occasions prior to our trip to Baltimore.  After our trip to Baltimore, we spent a considerable amount of time in this case interviewing witnesses.  I talked with Mr. Bates alone and told him that we might at some point want

24

to recommend that he change his plea ... and that we felt that might be the best way to save his life ....  We did not discuss it in detail at that time, and I just asked Mr. Bates to be thinking about that.  On the next occasion we met, Mr. Peters was present; and the psychiatrist, Dr. Griffin from Nashville, was also present.  At that time, we discussed with Mr. Bates at considerable length the pros and cons of a change of plea.  Of course, Mr. Bates had previously been advised of all the elements of the offense.  He had previously been advised of the range of punishment.  He was again advised of the range of punishment and was told that if he pleads guilty to first degree murder, the only alternatives that the jury would have at the sentencing phase are life imprisonment or death in the electric chair.  Mr. Bates acknowledged that he understood this.  After some discussion regarding the pros and cons, Mr. Bates advised us that it [was] his decision ... to enter a plea.  This all took place prior to the conference you have referenced in your chambers.  After that conference in chambers, the Court indicated that it had problems with the admissibility of the confession.  We, at that time, went back to Mr. Bates and told him we thought it was premature at that time to make this decision.  Quite frankly, we had felt prior to that time that the Court would overrule our motion.  We felt it was a good motion and still feel that it is, and we have so advised Mr. Bates.  We went back and talked to Mr. Bates, advising him that we thought it

25

was premature at that time to make a decision pending the Court's ruling on the suppression motion. <u>After the Court ruled on the suppression motion, we again went and talked to Mr. Bates. That was last night. We spent a considerable amount of time in the Coffee County Jail, talking with Mr. Bates and advising him. It is still his decision, based upon our recommendation, to enter this plea</u>.

(Emphasis added).

At that point, the trial court addressed the petitioner in open court to insure that the petitioner understood his rights and that his plea was voluntary. The petitioner acknowledged that his decision to plead guilty was his, voluntarily and freely. The trial court then accepted the plea. The state read the statement of facts into the record. The trial court asked the petitioner whether the stipulations were true, to which the petitioner answered that "[m]ost of it was right."

Thereafter, the following colloquy took place:

THE COURT:     Gentlemen, there is something in this order that I did not understand when the preliminary discussion took place. It says, by entering this plea of guilty, the defendant does not waive his objection to or his right to appeal the order overruling the motion to suppress the confessions .... It was my understanding that as far as the guilt or innocence portion is concerned, that was put to rest by this plea agreement. <u>If you desired an appeal ... [of] the order of May 1st, that</u>

26

|  |  |
|---|---|
| | <u>would relate to the issue of punishment</u>. |
| MR. PETERS: | Under the law, we have a right to not waive our objection. |
| THE COURT: | Well, I have a right not to accept the guilty plea under circumstances that I deem appropriate. |
| MR. PETERS: | The only time this would be required is if it were certified and dispositive of the issue. |
| THE COURT: | No, sir. I have a right to accept or reject a plea at any time. I did not understand on the preliminary discussion that this issue was retained as to the guilt or innocence phase of this trial .... |
| MR. PETERS: | --<u>It is not retained, ... as to the guilt or innocence phase</u>. It is retained insofar as they are going to introduce this later. We cannot wait. I don't see any other way that we could word that. |
| THE COURT: | Mr. Attorney General, do you have any input into this? |
| MR. RAMSEY: | ...Maybe it could be added to the order, "would not waive objection to the confession at the penalty phase." |
| THE COURT: | I do not know if that would suit them or not. Is guilt a contested issue in this case? |
| MR. PETERS: | <u>Guilt is not a contested issue</u>. |
| THE COURT: | The wording of this sentence here troubles me. I will let you all talk about it if you want to, but this does not comport with my understanding of what was conveyed to me prior to the entry of this plea. I was of the impression that |

27

the matter of guilt or innocence was put to rest and that there would be no appeal on any issue as to the guilt phase of the trial, and that <u>you were merely reserving and preserving the right to appeal the issue of the confession order of May 1, 1987, if and when it was introduced in the penalty phase</u>. I notice that Mr. Ramsey is nodding in the affirmative. Is that your understanding of it, Mr. Ramsey?

MR. RAMSEY: Yes, Your Honor.

\* \* \*

MR. PETERS: --Couldn't we simply retype that or note that? It is our intention to enter a plea of guilty without <u>waiving our objection, insofar as they are going to attempt to introduce this at the penalty phase</u>. We do not want them to indicate that we have waived our objection.

THE COURT: I would like for that to be added in. I signed this certification concerning my warning him about his rights, the plea of guilty, and so forth. That certification is still true, but I am not going to accept this plea with the wording of that last sentence in this plea of guilty statement that has been signed by the defendant. I did not realize that was in there, and that was not my understanding. Look at this and change it.

\* \* \*

MR PETERS: We have agreed that these confessions are not dispositive. This is somewhat peculiar because this is a

28

bifurcated trial. It says that if the issues presented for you were not waived as a matter of law by the plea of guilty--I would assume that is the only thing we reserve. That is more or less automatic even if it is not in there. If we appeal, we can raise, as an appealable issue, that we didn't waive it as a matter of law, not as a matter of fact or stipulation or agreement. I want to make it clear that, by entering this plea of guilty, we are not waiving our right to object to its admissibility or appeal from that if they introduce it at the penalty phase.

THE COURT: This is purely and simply if it is introduced at the penalty phase?

***

THE COURT: The matter of guilt or innocence is now and forever more put to rest; is that correct?

MR. PETERS: No. Let me explain. It is to the extent that the law allows.

THE COURT: The annotations of that portion of the rule say that matters are not waived as a matter of law such as the right to counsel, conviction under an invalid statute, and things of that nature. I really have some doubt that there is any problem with this, but the wording seems to make an exception above and beyond what the rule says. I didn't understand it that way, and the Attorney General didn't understand it that way.

MR. PETERS: We can't make an exception under that section that is any different from what that section says, but we want to

29

make it clear that we are not waiving that. <u>I think we have reworded it to make it abundantly clear that we are going to preserve our objection, as well as our appeal on it if they introduce it at the penalty phase</u>.

THE COURT: Things that are not waived as a matter of law are not waived. I cannot change it, and you cannot.

MR. BEAN: Whether that is in the order or not, they are not waived.

THE COURT: That's right, such as the examples they give in the annotation. I want to have a clear understanding about it, and I want to make sure I understand and the Attorney General understands what is happening here. My thinking was that the matter of that order of May 1st, as it regards guilt or innocence, is put to rest. <u>It is only pertinent and appealable as it may relate to the issue of punishment</u>.

MR. PETERS: Unless we agree that it was dispositive.

THE COURT: And you have said that it is not dispositive.

MR. PETERS: That's right.

THE COURT: You have said there was ample evidence in the record otherwise that makes it not dispositive.

MR. PETERS: The General has indicated that this is two trials, but it is actually one trial. I want to make it clear that they do not introduce the confession and say, "You have already entered a plea of guilty." We have a right to object to those things.

30

| | |
|---|---|
| THE COURT: | I do not think he is saying that. What do you say, Mr. Attorney General? |
| MR. RAMSEY: | No, Your Honor. |
| MR. PETERS: | We have reworded it. (Handing document to the Court.) |
| THE COURT: | This is what is proposed to be entered at the end of this order above signatures: |

<u>By entering a plea of guilty, the defendant does not waive his objection to, or his right to appeal from, the order overruling the motion to suppress the confession heretofore entered if introduced at the penalty phase of the trial and as it relates to the penalty phase of the trial.</u>

I didn't understand that if it is introduced at the penalty phase of the trial, it would trigger the right to raise that question as to guilt or innocence.

| | |
|---|---|
| MR. PETERS: | Your Honor, the only way it would do that is in respect to those matters that were not waived as a matter of law. |
| THE COURT: | Is there any problem with it as it is worded now, Mr. Attorney General? |
| MR. RAMSEY: | No, Your Honor. |
| THE COURT: | All that has been added is, "if introduced at the penalty phase of the trial" is that correct? |
| MR. SHELTON: | In essence. Mr. Peters, in his handwritten proposal, withdrew the actual rules section. |

31

MR. PETERS:       That should be introduced as
                          a substitute for that last
                          phrase.

* * *

THE COURT:       Is it understood that the
                          matter of guilt or innocence is
                          now put to rest?  Is that
                          correct, Mr. Peters?

MR. PETERS:       Except to the extent of those
                          matters that, as a matter of
                          law, are not waived.

THE COURT:       As to those matters, none of
                          us have control over that
                          anyway.

MR. PETERS:       That's correct.

THE COURT:       Then I will accept the plea
                          under those circumstances.

After hearing testimony on this matter at the post-conviction hearing from two medical experts, each of the trial defense attorneys and the petitioner and his legal expert, the post-conviction court made the following findings of fact:

> That the petitioner, Bates, did in fact knowingly and intelligently enter his guilty plea, and that trial counsel for the petitioner, attorneys Robert Peters and Roger Bean, discussed, advised and consulted with petitioner concerning entry of the guilty plea on numerous occasions prior thereto; that the petitioner upon informed advice of trial counsel accepted the formulation of a trial strategy of entry of a guilty plea without regard to the admissibility of previous confession or confessions, and that petitioner was advised of and concurred in the strategy that would attempt to reserve the right to appeal the admissibility of the confession or confessions notwithstanding a plea of guilty to the Indictment if the confession or confessions were introduced during the sentencing phase of the trial; that petitioner was not advised that a guilty plea would preclude the prosecution from offering into evidence prior confessions; that the petitioner was in fact informed that upon entry of a guilty plea he would thereafter forever waive his right to appeal the issue of his guilt or innocence; that trial counsel was aware that a guilty plea would legally constitute a waiver of appeal as to the

admissibility of the confession in the guilt or innocent phase of any trial, but as a trial tactic attempted to preserve such a right of appeal nevertheless; that the assertions regarding a "plea agreement" document made by petitioner are not founded in the record, and that the trial record and the personal knowledge of the undersigned establish that petitioner's guilty plea was in full compliance with all procedural rules, statutory requirements and case law of the state of Tennessee and the United States; that while the proceedings relative to the confessions of petitioner may have been confusing to him it appears in the record that they were advantageous to him in that he obtained a review of these issues on appeal which he probably would not have otherwise obtained if the matter had been handled in a different fashion; that based upon the record the petitioner was capable of and did understand and comprehend the guilty plea proceedings, and accordingly the Court finds that the record fails to establish by a preponderance of the evidence that the guilty plea was not knowingly and voluntarily entered in any respect with regard to pain medication and that the assertion of petitioner that his medication was "manipulated" by the State or the Sheriff is without basis in fact in this record.

This court is bound by the post-conviction court's findings unless the evidence preponderates otherwise. Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). This court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Moreover, questions concerning the credibility of witnesses and weight and value to be given their testimony are for resolution by the post-conviction court. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

As indicated, this record demonstrates that the petitioner knowingly and voluntarily entered his plea of guilty. Any conflicting testimony as to whether his trial counsel fully advised the petitioner concerning the ramifications of his guilty plea, especially regarding the suppression issue, was resolved by the post-conviction court. The evidence simply does not preponderate against those findings.

## II

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). Should the petitioner fail to establish either factor, no relief is warranted. As to guilty pleas, the petitioner must establish a reasonable probability that, but for the errors of his counsel, he would not have entered the plea and would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985).

On appeal, the findings of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991); Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the petitioner to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

Here, the petitioner claimed his trial counsel performed ineffectively in several different ways. While the trial judge did not address each of the petitioner's claims, he did make the following ruling:

> The Court finds that ... the assistance rendered to petitioner was that as mandated by Baxter, supra, and Strickland, supra ... not only has petitioner failed to prove by a preponderance of the evidence that he received ineffective assistance of counsel and that such ineffective assistance of counsel altered the outcome of his trial, but to the contrary the undersigned finds and holds that the preponderance of the evidence shows that petitioner did in fact receive effective assistance of counsel as contemplated by the above authorities.

34

Initially, the petitioner contends that trial counsel failed to adequately explain the effects of pleading guilty in relation to the motion to suppress. He submits that his counsel represented that they would try to preserve his right to appeal for both the sentencing hearing and the guilt-innocence stage. The petitioner argues that his counsel encouraged the guilty plea without knowing whether they could actually preserve the issue. Moreover, the petitioner asserts that his counsel encouraged the guilty plea with the assumption that the motion to suppress would be overruled when, in fact, the trial court had expressed serious reservations about the admissibility of the confessions. The petitioner contends that this deficiency in his counsel's performances deprived him of his right not to incriminate himself. U.S. Const. amend. V; Tenn. Const. art. I § 9.

In response, the state submits that the guilty plea was part of a sound defense strategy. It contends that the deliberate waiver of appeal of an unconstitutionally obtained confession does not constitute ineffective assistance of counsel if pursued for obvious tactical reasons.

Here, trial counsel acknowledged at the post-conviction hearing that they were unsure whether they could actually preserve the suppression issue for appeal if the petitioner pled guilty. Because our supreme court did consider the issue on direct appeal, the strategy was sound, even though the merits of the argument were rejected. Our high court ruled that "[the petitioner] did not waive his objection to an order ... overruling a motion to suppress a confession, or his right to appeal in the event the confession was introduced at the penalty phase of the proceedings." State v. Bates, 804 S.W.2d 868, 871 (Tenn. 1991). The record clearly shows that the petitioner understood that should the trial court admit his

35

confessions at the sentencing hearing, the petitioner would not be allowed to withdraw his plea or otherwise contest his guilt.

Moreover, the petitioner has been unable to show how he was prejudiced by any advice to plead guilty. Had the petitioner chosen a trial as to his guilt or innocence, the introduction of the confessions would not have been reversible error:

> We have considered whether the error in admission of defendant's first confession into evidence was reversible pursuant to the harmless error requirement set forth in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Viewing the evidence as a whole, applying those standards, we are satisfied that admission of defendant's September 2nd statement was harmless beyond a reasonable doubt and there is no reasonable possibility that the evidence obtained contributed to his conviction. Most of the evidence in the case, with the exception of his actual admission to the homicide, was gathered by law enforcement officers during the course of their investigation of Ms. Guida's disappearance. Beginning with the first traveler's check, which was cashed in Abingdon, Virginia, defendant left a trail which led unerringly to him, up to and including his arrest, when he was found in possession of the vehicle she had leased on her fateful mission to Tennessee. Moreover, defendant made not two, but three statements. If we were to find that both of the statements to authorities were inadmissible ..., he would still have to overcome the unsolicited admission made by him to Paul Carter while both men were confined in the Coffee County Jail. This statement ... included all of the essential elements of the two admissions made to the authorities. Defendant's sentencing hearing, including the voir dire of the jury, consumed approximately two weeks, during which the jury members had the opportunity to observe him, his mannerisms, actions and conduct in the courtroom. Our review of the record leaves us with no reasonable doubt that the jury would have reached the same verdict without having heard the admission made by him which we have held should have been excluded from the record. They also had the opportunity to hear the mitigating circumstances proffered by him in evidence at the hearing. The defendant received a fair trial without any constitutional entrenchment.

Id. at 876 (emphasis added).

36

Next, the petitioner contends that trial counsel was ineffective for failing to obtain and introduce into evidence all of his medical and psychiatric records. He asserts that trial counsel was ineffective by failing to offer the records into evidence, rather than merely relying on the summaries provided by Dr. Griffin. The petitioner claims that additional documents and witnesses would have established for the jury his disadvantaged childhood, brain abnormalities, and his lack of treatment.

In response, the state argues that trial counsel was effectively filtering out damaging evidence about the petitioner through the testimony of Dr. Griffin. The state claims that this method of presenting the evidence was a sound tactical decision. In addition, the state contends that the petitioner failed to establish that the results of his sentencing hearing would have been any different had prior records been obtained by trial counsel and then displayed to the jury.

In death penalty cases, the jury may not be precluded from considering any aspect of a defendant's character or record as a basis for a sentence less than death. See Johnson v. Texas, 509 U.S. 350, ___, 113 S.Ct. 2658, 2665-66 (1993); Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality opinion). There is, however, no legal requirement that the accused must offer evidence at the penalty phase of a capital trial. State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989). See also Darden v. Wainwright, 477 U.S. 168, 185 (1986). "A strategy of silence may be adopted only after a reasonable investigation for mitigating evidence or a reasonable decision that an investigation would be fruitless." Tafero v. Wainwright, 796 F.2d 1314, 1320 (11th Cir. 1986). An investigation so inadequate as to fail to formulate an "accurate life profile" of the defendant may be the basis for post-

37

conviction relief.  Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995).  Yet the extent of investigation required is largely dependent upon information supplied by the defendant.  Burger v. Kemp, 483 U.S. 776, 795 (1987).  See also Whitmore v. Lockhart, 8 F.3d 614, 621 (8th Cir. 1993).  The United States Supreme Court has established the following standard:

> [W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

Burger, 483 U.S. at 795 (quoting Strickland v. Washington, 466 U.S. 668, 691 (1984)).

It is not ineffective to offer no proof in the sentencing phase of a death penalty trial when the mitigating evidence was already adequately presented to the jury at the guilt-innocence stage or when the evidence was as potentially harmful as helpful.  Both of these circumstances presume an adequate background investigation.  Cooper v. State, 847 S.W.2d 521, 531 (Tenn. Crim. App. 1992).  As stated in Melson, "[c]ounsel are required to exert every reasonable effort on behalf of a client both in the investigation and in the trial of a case."  772 S.W.2d at 421.

In Cooper, our court upheld the trial court's finding of ineffective assistance where trial counsel chose not to obtain the hospital records, commitment documents, emergency evaluation documents, or school records explaining the petitioner's learning disabilities and problems.  847 S.W.2d at 530-31.  Moreover, trial counsel failed to seek witnesses from the petitioner's community or past employment who might corroborate pertinent background information.  Id. at 531.

38

The court found "no record of the trial attorney making any independent investigation of the petitioner's background and history other than talking with the petitioner's mother and sister, whose information he did not pursue." Id.

Here, however, trial counsel did not act "in a factual void in an unjustified manner." Knighton v. Maggio, 740 F.2d 1344, 1350 (5th Cir. 1984). Although counsel did not uncover all of the medical and correctional records pertaining to the petitioner and his family, there appears to have been a diligent investigation. Background research included trips to West Virginia and Maryland. The first nine exhibits introduced at the post-conviction hearing were the results of their investigation. In our view, the record supports the trial court's conclusion that the investigation of the petitioner's history and background fell within the range of competent representation. Baxter, 523 S.W.2d at 936.

It is sound strategy to introduce only those documents most helpful to the defense. If the use of a live witness further protects the defense from damaging evidence, trial counsel can hardly be faulted for that. At trial, a report card from kindergarten, two report cards from second grade, two report cards from third grade, and four photographs of the petitioner when he was a child were presented to the jury. At the post-conviction hearing, Attorney Bean testified that he did not believe that burdening the jury with volumes of other records would be an effective way to present the defense. Consequently, there was a reliance upon Dr. Griffin to distill the information in a way favorable to the petitioner. In our view, trial counsel cannot be said to have been ineffective for failing to introduce these records as exhibits. The strategy utilized fell within professional standards.

Next, the petitioner argues that trial counsel was ineffective for failing to have neuropsychological testing for possible brain damage. The state maintains that in light of Dr. Griffin's medical testimony, additional neurologic testing would have added little to the testimony at trial.

At the post-conviction hearing, the petitioner and the state presented expert testimony as to possible neurological damage. Dr. Auble testified that neuropsychological testing indicated that the petitioner lacked the ability to conform his actions; this expert concluded that the emotional control exhibited by the petitioner ranged from limited to nonexistent. On the other hand, Dr. Blau found no indication that the petitioner was under the influence of extreme mental or emotional disturbance when he killed the victim. Dr. Blau concluded that the petitioner had never been substantially impaired as a result of either mental disease, defect, or intoxication.

At the conclusion of the post-conviction hearing, the trial court "was most impressed with Dr. Blau, his credentials and his testimony." As to areas of disagreement between the experts, the trial court "accept[ed] the testimony of Dr. Blau as the most credible, reasonable and realistic." Our scope of review as to the accreditation of witnesses is limited. We must defer to the findings of the trial court. Taylor v. State, 875 S.W.2d 684, 686 (Tenn. Crim. App. 1993) (citing Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990)).

Next, the petitioner argues that trial counsel was ineffective for failing to object to certain comments by the prosecution. He specifically complains that the reference to his lack of remorse violated his right against self-incrimination. U.S. Const. amend. V, VIII, and XIV; Tenn. Const. art. I §§ 8, 9, and 16. In response, the

state points out that our supreme court considered and rejected the assertion of error on direct appeal. Because it ruled that they did not affect the verdict or otherwise prejudice the petitioner, the state contends the petitioner has failed to establish any ineffectiveness on the part of counsel for failing to object.

Our supreme court made the following observation:

> It was clearly improper for the State's counsel to make the comments which they did. Likewise, the name-calling was inappropriate .... However, considering the nature of the crime involved and all the facts surrounding the homicide, we have concluded that the improper conduct in closing argument by the State's lawyers did not affect the verdict to the prejudice of defendant, and did not warrant reversal of the conviction. However, they might be well advised to adhere more rigidly to the disciplinary rules promulgated by the court for the conduct of counsel at trial.

Bates, 804 S.W.2d at 881. It is apparent that the high court carefully reviewed the comments made by the prosecution. While concluding the comments made by the prosecution were improper, the court found that the comments did not affect the results of the trial. Moreover, during the original proceeding, Dr. Griffin indicated that the petitioner showed little remorse for the murder. Thus, there was a basis in the evidence for the comment about lack of remorse. In summary, we find for the state as to this claim.

The petitioner also argues that trial counsel was ineffective by failing to object to several inflammatory statements made by the prosecution during closing arguments. He contends that the combined effect of the statements so tainted the record that he could not have received a fair sentencing hearing.

As examples of the state's improper comments not objected to by trial counsel, the petitioner cites to the district attorney's statement "[t]hank God this man

41

hasn't got into bombing yet," and "[m]y son is hyperactive--he hasn't killed anyone." He also challenges the district attorney's statement that the backgrounds of other people in Coffee County were "not all so different from the defendant." Finally, he complains that the district attorney was guilty of baseless conjecture when he argued that "there is no telling what else he did" in his hour with the victim before her death.

Closing argument must be temperate, must be predicated on evidence introduced during the trial of a case, and must be pertinent to the issues being tried. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). In our assessment, these statements did qualify as either irrelevant or baseless conjecture. Trial counsel, who acknowledged that they let some demeaning references slip by, should have objected to these comments contemporaneously. Yet, in context, trial counsel's failure to object during the closing argument was hardly the basis for the jury verdict. As we stated previously, our high court has already reviewed the comments and determined the error did not affect the outcome of the trial.

The petitioner next claims that his trial counsel was ineffective for stipulating his prior convictions in Maryland for assault and battery upon a correctional guard and for armed robbery. At trial, the defense did in fact stipulate that the petitioner had the two prior convictions. At the post-conviction hearing, Attorney Alderman, the legal expert, testified that trial counsel should have objected to the introduction of this evidence and that, in general, counsel should never stipulate to the existence of an aggravating factor at a death penalty sentencing hearing.

42

In Richard Caldwell v. State, No. 9, slip. op. at 2 (Tenn. Crim. App., at Jackson, Mar. 21, 1990), however, this court ruled that trial counsel's refusal to stipulate to prior convictions would have only delayed, not prevented, their admission into evidence; thus there was no ineffective assistance. Here, because the prior convictions were admissible, trial counsel cannot be faulted for failing to object.

Next, the petitioner argues that trial counsel was ineffective for failing to object to the use of kidnapping as an underlying felony to support the felony-murder aggravating circumstance, even though the petitioner had not been charged with kidnapping the victim. Without addressing the merits, the state summarily argues that this issue has been waived by the petitioner's failure to cite authority or make reference to the record in support of his argument. See Tenn. R. App. P. 27(a); Tenn. Crim. App. R. 10(b).

During closing argument, the prosecution made the following statements:

> [T]he State insists in this case that this defendant committed this murder--that he killed Julie--while he was engaging in, or was attempting to commit, or was fleeing after committing or attempting to commit these crimes: burglary, larceny--first of all, the items from the Curtis Mayes residence in Kentucky, and secondly, Julie's car at the Holiday Inn--and kidnapping when he abducted her as she jogged down Ester Lane on the morning of July 23, 1986. When he put a gun on her, abducted her, and forced her against her will and confined her against her will, he kidnapped her. He kidnapped her and escorted her to her place of execution; so it is the State's position in this case that we have proven to you beyond a reasonable doubt the existence of this aggravating circumstance.

The trial court instructed the jury on the felony-murder aggravating circumstance:

> The murder was committed while the defendant was engaged in committing, or was an accomplice in the

43

> commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any burglary, robbery, larceny or kidnapping.

There was neither a charge nor a conviction of kidnapping. The trial court provided the jury with the statutory definitions of robbery, kidnapping, and larceny as required when the state relies upon this aggravating circumstance. See State v. Hines, 758 S.W.2d 515, 521-24 (Tenn. 1988); State v. Moore, 614 S.W.2d 348, 350-51 (Tenn.1981).

The state correctly points to the waiver rule when no authority has been cited. There may, however, be no case directly on point. See Tenn. R. Evid. 404(b). In State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), the supreme court did rule that a conviction for kidnapping, when incidental to a robbery, violated due process:

> [W]hether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction.... [O]ne method of resolving this question is to ask whether the defendant's conduct "substantially increased [the] risk of harm over and above that necessarily present in the crime of robbery itself."

Id. at 306 (citations omitted) (third alteration in original). If there existed a plausible argument for trial counsel to have objected to the references to kidnapping, there should have been an objection. When there has been inadequate briefing on an issue, this court is not inclined to rule on the merits unless absolutely necessary in the interests of justice. Here, the petitioner has been unable to show how he was prejudiced by any possible error because the proof overwhelmingly supported the finding that the murder was committed during the perpetration of a robbery or larceny, a legitimate aggravating circumstance. Tenn. Code Ann. § 39-2-203(i)(7)

44

(repealed 1989). A finding that this statutory circumstance would have also been applicable for kidnapping, a part of the same statutory section, would have been, in our view, mere surplusage.

The petitioner also argues that when he expressly indicated to counsel that he wanted and needed to testify, counsel was ineffective for advising otherwise. He submits that he had a constitutional right to testify.

At the post-conviction hearing, Attorney Bean testified that the petitioner vacillated on whether he wanted to testify. No decision was made until the close of proof. After a lengthy consultation with his trial attorneys, the petitioner agreed that it was not in his best interest to testify even though he had the right to do so. Attorney Bean believed the petitioner, who could not control his temper, would "scare the jury to death." Moreover, the petitioner would have been subject to cross-examination on prior events in the Maryland penitentiary.

Attorney Alderman confirmed that the petitioner should have been advised to testify:

> In a capital phase if the defendant does not testify, unless there is a substantial amount of proof that allows the jury to see him as a human being, they won't, if he doesn't testify because he is the only one who can actually give himself the humanity that may be necessary for the jury not to vote to kill him[. S]o if he wants to testify, he certainly should be allowed to do that, yes, sir.

The following factors tend to indicate whether the failure of a defense attorney to call the defendant to testify constitutes ineffective assistance:

> (1)     only the victim and the defendant were present when the offense was committed;

45

(2)    only the defendant could present a "full
       version of [his] theory of the facts";

(3)    the defendant's testimony could not be
       impeached by prior criminal convictions;

(4)    the defendant could give an account of the
       relationship with the victim; and

(5)    the attorney had let in objectionable,
       prejudicial testimony with the intention of
       clarifying it with the testimony of the
       defendant.

State v. Zimmerman, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991). There is a strong presumption that counsel's assistance falls within the wide range of reasonable professional assistance. In overcoming this presumption, the petitioner must show that the alleged deficiency was unsound trial strategy. Strickland, 466 U.S. at 689; Hartman v. State, 896 S.W.2d 94, 104 (Tenn. 1995).

In our view, the trial court correctly found that the petitioner was advised of his right to testify and made a well-counseled decision to waive that right. The advice was based on a sound trial strategy, especially considering the petitioner's demeanor, his lack of control, and his history of violent behavior. Thus, we find no merit to this claim.

Next, the petitioner argues that trial counsel was ineffective by misinforming the jury that the petitioner had the burden of proof to prove mitigating circumstances by a preponderance of the evidence. He submits that his counsel was ineffective for failing to object to the prosecution's characterization of the burden of persuasion. The petitioner also complains that trial counsel did not object when the state argued to the jury that the aggravating circumstances simply had to outweigh the mitigating circumstances. He asserts that the language of the pre-1989 statute, under which the trial court instructed the jury, did not clarify the burden

46

of proof as to mitigating and aggravating circumstances, failing to correct his counsel's incorrect statement of the law.

The state contends that the petitioner has taken trial counsel's comment on the burden of proof out of context. The state submits that trial counsel had merely announced its intention to introduce evidence that certain mitigating factors existed. Furthermore, the state contends that the trial court correctly charged the jury with regard to mitigating and aggravation circumstances.

During closing argument, trial counsel made the following statement:

The burden of proof to prove mitigating circumstances is on the defendant, and we accept that burden of proof. Our burden of proof is not beyond a reasonable doubt, but rather by a preponderance of the evidence, by 51 percent of the evidence, more likely than not.

At the post-conviction hearing, Attorney Bean testified that he assumed the defense had the burden of proof to show mitigating circumstances because the state was not going to introduce proof of mitigating circumstances. He conceded that he did not know whether he had given the jury a correct statement of the law.

The statute under which the petitioner was sentenced, Tenn. Code Ann. § 39-2-203(g) (repealed 1989), required only that the jury find there were no mitigating circumstances sufficiently substantial to outweigh any statutory aggravating circumstances proved beyond a reasonable doubt by the state. Our supreme court has held that this statute, "taken in context, clearly outlines where the burden of proof lies." State v. Boyd, 797 S.W.2d 589, 596 (Tenn. 1990); State v. Howell, 868 S.W.2d 238, 258 (Tenn. 1993). The statute has also withstood constitutional attack. See State v. Thompson, 768 S.W.2d 239, 251-52 (Tenn. 1989).

Here, counsel clearly misstated the burden of proof. The defense is not required to present any proof at the sentencing hearing. See Melson, 772 S.W.2d at 421. Under Strickland, however, the petitioner must establish that the services were deficient and then show that the deficiencies "actually had an adverse effect on the defense." 466 U.S. at 693. If unsuccessful on either of the two prongs, the petitioner is not entitled to relief on this ground. While the petitioner has clearly shown deficient performance by counsel's misstatement of law, he has failed to show that it actually had an adverse effect. The jury is presumed to have followed the trial court's instructions on the burden of proof. See State v. Lawson, 695 S.W.2d 202, 204 (Tenn. Crim. App. 1985). As indicated, the trial court accurately instructed the jury on the applicable law.

Furthermore, trial counsel cannot be found ineffective for failing to object to the prosecution's statement on the burden of proof; the argument by the prosecution reflected the language of the statute at the time of the sentencing hearing. Our supreme court has ruled that the previous statute, "taken in context, clearly outlines where the burden of proof lies." Boyd, 797 S.W.2d at 596.

### III

Next, the petitioner contends that the state failed to disclose information that could have led to material mitigating evidence in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963). More specifically, the petitioner argues that the state failed to disclose the results of a polygraph examination of Littleton, a possible suspect in the case, which implicated Littleton in the murder.

The state asserts that the petitioner failed to demonstrate that Littleton's polygraph was either favorable to the defense or was suppressed by the

48

prosecution.  Moreover, the state submits that the comprehensive "open-file" policy precludes any claim of withheld evidence.  It also argues that trial counsel knew of no factual basis for a defense centered upon Littleton.

In Brady, the United States Supreme Court ruled that the prosecution had the duty to furnish exculpatory evidence upon request by the defense.  373 U.S. at 87.  Exculpatory evidence was defined as pertaining to the guilt or innocence of the accused and/or to the punishment which may be imposed if the charge results in a conviction.  State v. Marshall, 845 S.W.2d 228, 232 (Tenn. Crim. App. 1992).  Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87.  The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial.  Marshall, 845 S.W.2d at 232-33.

The evidence which is alleged to have been withheld by the state must be material.  Id.  Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different.  United States v. Bagley, 473 U.S. 667, 682 (1985).  The appropriate standard of materiality, according to Supreme Court authority, is not determined by its effect upon the defense's ability to prepare for trial but, instead, relates to the issues of guilt or innocence:

> [I]f the omitted evidence creates a reasonable
> doubt that did not otherwise exist, constitutional error has
> been committed.  This means that the omission must be
> evaluated in the context of the entire record.  If there is
> no reasonable doubt about guilt whether or not the
> additional evidence is considered, there is no justification
> for a new trial.  On the other hand, if the verdict is
> already of questionable validity, the additional evidence

49

of relatively minor importance might be sufficient to
create a reasonable doubt.

United States v. Agurs, 427 U.S. 97, 112-13 (1976).


It appears that on August 7, 1986, a polygraph examination was given

to Littleton, one of the hitchhikers picked up by the petitioner in Bristol, Tennessee.

The polygraph examiner detected an indication of deception to the following

questions:

> 5. Are you lying to me about being picked up by that
>    person? No.
>
> 6. Do you know the true identity of the person
>    with you and FRAN when FRAN cashed
>    any of those traveler's checks? No.
>
> * * *
>
> 3. Are you deliberately lying to me about what
>    you were doing on July 23, 1986? No.
>
> 5. Did you cause the disappearance of that
>    woman named JULIE? No.
>
> 8. Were you in Manchester, Tennessee, on
>    July 23, 1986? No.
>
> 9. Have you personally seen or talked to that
>    woman [n]amed JULIE? No.


At the post-conviction hearing, Attorney Bean testified that the district

attorney general's office "maintained ... an open file policy." He further testified that

it was his impression that the defense had everything the state had. Attorney Bean,

who received a copy of an FBI interview sheet on Littleton, did not recall receiving

any information relative to a polygraph examination; Attorney Peters was never

asked. Attorney Bean further testified that he did not recall any facts ever being

communicated to him that would have justified a defense centered around Littleton's

involvement in the murder; he did not think the polygraph results would have been

50

admissible at trial.  See State v. Adkins, 710 S.W.2d 525, 528-29 (Tenn. Crim. App. 1985).

It should be noted that at the sentencing hearing, Littleton testified for the state that he was first approached about the investigation on August 6 in Wisconsin.  Littleton testified that "[t]hey asked me if I would be willing to take a lie detector test.  They asked me a bunch of questions."  The defense did not cross-examine Littleton.

The post-conviction court merely found that the petitioner's allegations of a failure to disclose were not supported in the record.  The petitioner contends that the evidence preponderates against that finding.  The first question is whether the state failed to provide the defense with Littleton's polygraph test results.  Clearly the state had an open-file policy.  Attorney Bean, however, stated that he did not recall discovering any information about the polygraph results.  While, as the trial court ruled, there is an inadequate record for a determination that the state withheld the evidence, in our view, the evidence was exculpatory even though not admissible. It does not constitute material evidence unless there was a reasonable probability that it would have changed the results of the proceedings.  As stated in Augers, materiality is not determined by its effect upon the defense's ability to prepare for trial; instead, it relates to the issues of guilt or innocence.  427 U.S. at 112-13.

The argument that this information could have probably changed defense counsel's strategy is simply not supported by the proof.  The petitioner confessed his crime to a fellow inmate.  Littleton was not implicated in any of these statements.  None of the proof at the crime scene implicated anyone other than the petitioner.  No testimony presented at the trial or the evidentiary hearing suggested

51

that Littleton had any connection with the petitioner until after the murder or had any involvement in the commission of the crime.  Thus, the petitioner has been unable to establish the materiality of the polygraph results.  In summary, this record is insufficient to establish any violation of the Brady rule.

Accordingly, the judgment is affirmed.

_____
Gary R. Wade, Judge

CONCUR:

_____
Paul G. Summers, Judge

_____
L. T. Lafferty, Special Judge