IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 12, 2005 Session

# LAVELY BROWN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Knox County**
**No. 53713    Richard Baumgartner, Judge**

---

**No. E2004-00886-CCA-R3-PC - Filed August 8, 2005**

---

The Petitioner, Lavely Brown, was convicted of first degree murder, armed robbery, and aggravated kidnapping, and the trial court sentenced him, as a Range II offender, to life imprisonment for the murder conviction, and two concurrent sentences of forty years for the armed robbery and aggravated kidnapping convictions. On appeal, this Court affirmed the Petitioner's convictions and sentences. The Petitioner filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. On appeal, the Petitioner contends the post-conviction court erred when it dismissed his petition because: (1) the State withheld exculpatory information from him; (2) the State committed prosecutorial misconduct in its closing arguments; (3) the trial court conducted an improper ex parte conference with an appellate court judge; (4) the trial court improperly instructed the jury; and (5) he received ineffective assistance counsel. After thoroughly reviewing the record and the applicable law, we conclude that there exists no reversible error in the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Randall E. Reagan (at trial and on appeal), Knoxville, Tennessee, and Harold D. Balcom, Jr., Kingston, Tennessee (at trial) for the appellant, Lavely Brown.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

In January 1989, a jury convicted the Petitioner of first degree murder, armed robbery, and aggravated kidnapping. This Court summarized the facts on direct appeal as follows:

Appellant, Lavely Brown, appeals from his conviction by the Knox County Criminal Court finding him guilty of murder in the first degree, armed robbery and aggravated kidnapping. The trial court sentenced [A]ppellant to life imprisonment for the murder conviction plus two terms of forty years as a Range II offender for an especially aggravated offense on the armed robbery and the aggravated kidnapping, to be served concurrently with the life sentence.

. . . .

A review of the record reveals the following facts. The bound and nude body of Mr. Richard G. Mashburn was found in his West Knoxville apartment on May 14, 1986. Repeated stab wounds were the cause of his death. A pathologist, called by the State, testified that Mr. Mashburn had been killed several days prior to when the body was found.

. . . .

Appellant's accomplice, James Robinson, testified in detail as to how he and [A]ppellant entered Richard Mashburn's apartment with the intent to rob him. The men then tied Mashburn up and began searching for money. At that point, Robinson went into the bedroom to search it. He heard Mashburn beg for mercy and [A]ppellant answer that God could not help him any more. Robinson further testified that he returned from the bedroom just in time to see [A]ppellant stabbing the victim in the neck. The [A]ppellant testified that he was in no w[ay] involved with the murder.

State v. Lavely Brown, No. 1278, 1990 WL 112370, at *1 (Tenn. Crim. App., at Knoxville, Aug. 8, 1990), *perm. app. denied* (Tenn. Dec. 10, 1990). The Petitioner was sentenced, as a Range II offender, to life imprisonment for the murder conviction and to forty years each for the armed robbery and aggravated kidnapping convictions, to be served concurrently with each other.

On December 10, 1993, the Petitioner filed a petition for post-conviction relief, contending that his counsel was ineffective, and that the State failed to disclose exculpatory evidence. On September 26, 1996, a hearing was conducted, however, there is no order from the post-conviction court in the record before us. On May 25, 2001, the Petitioner filed an amended petition for post-conviction relief in which he contended that he received ineffective assistance of counsel, the State committed prosecutorial misconduct, and the trial judge committed various errors. On June 17, 2003, the Petitioner filed a second amended petition for post-conviction relief alleging more errors by the trial court and his trial counsel.

The following relevant evidence was presented at the Petitioner's hearing on his petition for post-conviction relief in 1996: The Petitioner testified that, after having difficulties with Robert Edwards, his first attorney at trial, Mike Dixon ("Counsel") was appointed to represent him. The

Petitioner recalled that his first attorney sent him a letter on May 5, 1988, stating that an individual named Patricia Byers[1] lived across the hall from the victim's apartment, she had complained about problems in that apartment, and she had given the police a composite drawing of the Petitioner.

The Petitioner identified a letter that he sent to Counsel on November 5, 1988, in which he discussed the letter about Byers and asked whether the composite drawing given by Byers was of the Petitioner or of someone else. The Petitioner stated that, in his letter to Counsel, he asked Counsel to investigate the matter, and Counsel did not respond to him about this request. He said that, after he was convicted, he learned that Counsel had communicated with Byers to determine if her testimony would have been helpful. The Petitioner said that he asked Counsel about Byers, and Counsel told him that he had received information after trial about Byers, namely that she lived across from the victim and saw a man entering the apartment. The Petitioner testified that the police interviewed Byers, and Counsel was presenting the issue at the motion for new trial. He said that, therefore, he assumed that Counsel never had this information. The Petitioner testified that Counsel told him that Counsel took a taped statement from Byers. The Petitioner testified that Byers was a witness that he would have wanted to testify on his behalf at trial because she saw the person that committed the offense. He testified that her testimony would have coincided with the testimony of the pathologist and two other witnesses who testified that the victim was alive after the time that the State said that the victim died.

On cross-examination, the Petitioner testified that he believed he was convicted because Counsel did not call Byers as a witness on his behalf at trial, and he stated that the whole outcome of his trial would have been different if Byers had testified. He testified that he did not agree that Byers drew a composite picture of him, and he said that, consistent with the pathology report, he was not in town at the time this incident occurred. He agreed that his co-defendant in this homicide pled guilty and testified that the Petitioner killed the victim. He conceded that two men testified at his trial that he told them, separately, that he had killed the victim, but he did not remember the details of their testimony. The Petitioner testified that, if Byers had testified, the Petitioner also would have called Darryl Dobbins to testify because the composite picture is actually of Dobbins, Dobbins' fingerprint was found in the apartment, and Dobbins was seen going into the apartment on May 11, 1986. The Petitioner agreed that a third person said in a tape-recording that the Petitioner admitted killing the victim.

The Petitioner testified that Counsel discussed his efforts to prepare the Petitioner's appeal with him, and he gave the Petitioner a copy of the appellate brief. The Petitioner stated that he did not point out any issues that he wanted raised in the appellate court because he trusted Counsel, and he was not familiar with the law. He agreed that Counsel raised a number of issues on appeal. The Petitioner testified that, when he received a copy of his appellate brief, he did not know that authority had to be cited for an issue to be considered on appeal. The Petitioner stipulated that the Court of Criminal Appeals addressed each and every issue raised in his appeal.

_____

[1]Patricia Byers, based on the record, is also known as Vicky or Vickie Williams. For consistency, we will use Patricia Byers throughout this opinion.

Counsel testified that he was appointed in August 1988 to represent the Petitioner, and he said that it is his routine to obtain all material from previous counsel. Counsel did not specifically remember doing so in this case. He testified that, according to his claim for attorney fees, he reviewed the information from the file that he received from the Petitioner's prior attorney. Counsel could not remember specifically whom he spoke to from the victim's apartment complex, but he remembered that at some time he talked with a manager. He said that, if a document was in the prior attorney's file, he most likely received the document. Counsel testified that, at trial, he introduced evidence about the amount of traffic in and out of the victim's apartment, the disturbances, and a fight between a man and a woman that occurred a few days before the date of the murder.

Counsel testified that he did not recall hearing about the composite drawing from Byers, but he admitted that it might have been helpful to try to show that the composite was not the Petitioner. He said that he did not know how much that would have helped the Petitioner's case because Counsel proved that many individuals, including some who testified against the Petitioner, were part of the steady traffic at the victim's apartment. He said that he was not able to prove that an individual had been to the victim's apartment subsequent to the killing because he did not know that information. Counsel testified that he was unaware of any document stating that Byers told the police that she saw an individual who was not the Petitioner enter the apartment after the victim's death, or that Byers recognized that person as someone who had previously entered and exited the apartment with a key. Counsel testified that this information seemed to be very important, and he asserted that this information was known to the police but not given to Counsel.

Counsel identified a document dated May 3, 1988, from the Petitioner's prior attorney's law firm, that stated the alternate names for Byers and said "locate." He also identified a memo, dated May 9, 1988, of a discovery conference with the Assistant District Attorney ("ADA") Dave Jennings that identified Byers and stated "Dave says is wrong about composite being [the Petitioner]." He agreed that if there was a composite drawing that was clearly not the Petitioner, such a drawing would have been helpful to the defense, but Counsel said that he had no trouble "proving that there [were] two dozen individuals going in and out of that apartment." Counsel identified a memo from a discovery conference with ADA Jennings in his file dated October 10, 1988, and he stated that there is no mention of Byers or a composite drawing. Counsel testified that he found out about Byers through another client, and, after the Petitioner's trial, he interviewed her and tape-recorded the interview. He said that this information was in an affidavit that was submitted with the Petitioner's amended motion for new trial, and he believed that the original tape was ruined by a flood in his office. Counsel identified a memo to the Petitioner's file dated April 4, 1989, that contained information about Byers, including her telephone number. He testified that, at that time, he and the Petitioner worked together to gather information about Byers in order to interview her.

Counsel agreed that his briefs indicated that, prior to trial, he did not receive any written statements made by Darryl Dobbins, a potential witness. He said that, because there was no statement, he was certain that he did not interview Dobbins, and he did not know of Dobbins' existence until he spoke with Byers. Counsel testified that he did not recall whether Dobbins was ever a "listed" witness for the State. Counsel remembered an identifiable fingerprint from the

-4-

victim's apartment, but he did not recall if the print belonged to Dobbins.

On cross-examination, Counsel testified that the Petitioner's trial lasted about one week. He agreed that the Petitioner's co-defendant gave important testimony, including that the co-defendant and the Petitioner had previously been in the victim's apartment. He said that two other witnesses, who testified that the Petitioner told them he had killed the victim, were also detrimental to the Petitioner's case. Counsel said that he was able to impeach the first witness, but he had a hard time "do[ing] much with" the second witness. Counsel said that another witness, William Wright, was in prison and eventually told police that the Petitioner had killed the victim. Counsel said that Wright refused to testify at trial, and the State introduced a tape recording of Wright instead. Counsel testified that he argued on appeal against the admissibility of the tape recording.

Counsel testified that this was a "hard-fought case," and he agreed that if he had known the details about Byers and Dobbins, he would have had them testify. He said that it was clear that Dobbins was "a regular" at the victim's apartment, along with a number of other young males. Counsel said that one critical issue at the Petitioner's trial was the timing of a trip the Petitioner took to Canada. Counsel explained that the timing of the trip was important in relation to the time of the victim's death. Counsel said that he was unaware of any issues that the Petitioner insisted that he raise on appeal that Counsel failed to raise, and that he tried to raise all significant issues. On redirect-examination, Counsel explained that Wright was in prison with the Petitioner's co-defendant, and gave his statement based on what the co-defendant said. At the conclusion of this hearing, the post-conviction court stated that it would issue an order based on this evidence. However, there is no order in the record before us.

The following relevant evidence was presented in 2003 at the Petitioner's hearings on his amended petition for post-conviction relief: Dr. Steven Frank Dunton, a forensic pathologist and the chief medical examiner of Gwinnett County, Georgia, testified that, at the Petitioner's request, he reviewed several documents, records, and transcripts in this case. He said that he also reviewed the photographs of the victim's body, Dr. Evans' testimony, and the autopsy report. Dr. Dunton agreed that the State's theory inferred that the homicide occurred on May 8, and the victim's body was found on May 14, six days later. He said that, based on the trial testimony that the temperature in the victim's apartment was maintained at seventy degrees and that there was no odor coming from the body, he did not believe that the body could have been in the apartment for six days prior to being found. Dr. Dunton testified that "a very generous estimation" of how long the body was there would be three days. He opined that the body was in the apartment "less than three days. It's probably less than half of that." He estimated that the body was there about twenty-four to thirty-six hours. Dr. Dunton testified that, based on his experience and his review of the evidence in this case, he would have suggested that the cross-examining attorney get as specific as possible about the post-mortem changes discovered at the autopsy by the forensic pathologist. He said that this would be especially important because the Petitioner had an alibi for a certain period of time before the victim's body was discovered.

On cross-examination, Dr. Dunton testified that he reviewed everything that Dr. Evans

reviewed, except for the actual body of the victim. He agreed that Dr. Evans stated that the victim had been dead three days prior to the body being found. He testified that he disagreed with Dr. Evans' testimony that, from the time of death, it would take four or five days, at about seventy-five degrees, for the victim's body to develop an odor. Dr. Dunton testified that it frequently takes about "a day or so" at seventy degrees. He said that it would take some time for the victim to die because he suffered stab wounds, and there is no way to determine the exact time of death for the victim. Dr. Dunton further testified that he would have suggested questions for Counsel to ask Dr. Evans in order to show the jury the differences in a dead body at approximately one day, two days, three days, or six days.

Douglas Trant, a criminal defense attorney, testified that he reviewed the records in this case, specifically Dr. Evans' testimony and reports from the Petitioner's expert pathologist, Dr. Dunton. He said that, in this case, the time of death of the victim was a major issue, and, if he had been the attorney, he would have hired a pathologist to assist him in the case. He explained that, especially with Dr. Dunton's testimony that the body would have been dead no more than seventy-two hours, it would be crucial to have expert assistance in this area. On cross-examination, Trant testified that, in reaching this conclusion, he only reviewed the affidavit from Dr. Dunton and the testimony of Dr. Evans. He said that he did not review any other information from the trial, and he was not provided the trial testimony. He said that he did not review Counsel's closing argument, but he agreed that it would be "good lawyering" for an attorney to argue that the State's witness said that the victim had been dead for no more than three days. Trant testified that he was unaware that the victim had bled for some period of time before he actually died.

ADA Jennings testified that he was the prosecuting attorney in this case, and he said that, after viewing the videotapes of three interviews with witnesses about Wright, he had no independent recollection of conducting the interviews because they happened so long ago. ADA Jennings testified that Terry Henry, an investigator, was present during Jennings' interview of Wendy Rice. He testified that he believed he received a telephone call the night before Rice's interview because he made reference to it on the tape. ADA Jennings said that he asked if Rice knew Wright, and Rice said Wright discussed with her some of what the Petitioner told Wright. ADA Jennings testified that Rice also stated that Wright told her that the person who committed the crime was a black male whose name started with an "L."

ADA Jennings testified that there were two other individuals, that were sisters, that he interviewed concerning Wright. The women told ADA Jennings that Wright told the women that he knew who committed the murder. Based on ADA Jennings' recollection, these statements were not an admission of guilt from Wright, but were "teasing" that Wright knew who committed the murder, and the women did not. ADA Jennings said that one of the sisters, Melissa Robbins, was Wright's girlfriend, and she said that Wright told her that he was going to try to get reward money out of this case. ADA Jennings said that Robbins stated that Wright was "acting real funny" about the situation, and she began to wonder if Wright committed the murder. Robbins told ADA Jennings that Wright said that he knew where the clothes that the killer wore during the murder were located.

ADA Jennings testified that neither Rice nor the sisters stated that Wright told them the Petitioner's name. He stated that none of the information from these interviews contradicted the Petitioner telling several people that he committed the murder, and he said that he did not hear anything that indicated that anyone other than the Petitioner committed this murder. ADA Jennings testified that he did not believe that any of these interviews contained exculpatory evidence. He said that, if he had thought any information was exculpatory, he would have provided it to the defense.

ADA Jennings identified reports concerning a polygraph examination given to Michael "Mousy" Settles, and he said that they were submitted to Terry Henry, an investigator who assisted him on the case. He said that the reports were part of his investigation and were in his file. He testified that he did not remember if he made the reports available to Counsel.

On cross-examination, ADA Jennings testified that it is his policy to examine all the evidence in a case, and, if there is exculpatory evidence, he will turn it over to the defense. He said that, at the time of the interviews, and even after relistening to the interviews for the hearing, he did not find anything that would qualify as exculpatory evidence. ADA Jennings testified that he remembered this trial, but he did not recall specifics about the evidence. He said that he recalled that the victim's time of death was an issue at the trial. ADA Jennings testified that, based on the victim's injuries, the victim could have lived if he had received medical attention, but the victim probably bled slowly, making it difficult to determine the exact time of death. ADA Jennings testified that, in his opinion, Counsel is a very effective trial attorney.

The Petitioner testified that he was represented by Counsel in this case, and, before his trial, he had not seen the tapes of the interviews of three witnesses, Rice, Julie Robbins Johnson, and Melissa Robbins. He said that, at his trial, Wright refused to testify, and, originally, the trial judge was not going to allow the jury to hear Wright's taped statement, but the trial judge reversed his decision and allowed the tape. He said that he discussed this with Counsel. The Petitioner explained that he believed that the trial judge had a conversation with a judge on the Court of Criminal Appeals about the admissibility of the tape. The Petitioner conceded that he was not present during this conversation. He said that neither he nor Counsel were notified of this discussion, and, to his knowledge, Counsel did not request this conference. He said that Counsel objected to the admission of the tape because it violated the Petitioner's right to confront witnesses.

The Petitioner testified that Counsel did not tell him that he had the right to not testify. Counsel told him that he "had to or [he] would have been found guilty." He said that he did not want to testify because he had a prior conviction, and he was examined about his prior record on cross-examination. The Petitioner testified that he and Counsel discussed the possibility of resolving this case by a plea agreement, but Counsel failed to consult him on that issue.

On cross-examination, the Petitioner testified that he initially hired an attorney in 1993 to represent him in this post-conviction matter. He said that his current counsel filed amendments to his post-conviction petition. He said that he did not raise all of the issues in his 1993 petition because he "was never aware of this information. It was withheld by [the State]." He agreed that

the trial transcript was available, but he stated that other evidence was not turned over to him. He agreed that he knew that the time of death of the victim was an important issue, and he said that he discussed this with the attorney that originally filed his petition for post-conviction relief. The Petitioner agreed that there were two witnesses and a co-defendant that testified that the Petitioner committed this crime.

Counsel testified that he was the Petitioner's trial attorney, and, based on the length of time that had passed, he did not have a good recollection of the details of the Petitioner's case. He said that he would have pursued any witnesses to statements made by Wright that were inconsistent with Wright's testimony if he had such information, and that he would have discussed any such information with the Petitioner. He agreed that one basis for impeachment is whether a witness is biased by an interest in reward money. Counsel testified that, if the tape of Wright's statement had contained names of witnesses, he would have investigated that information. He said that the case was "filled with nefarious characters" that would have been difficult to locate. Counsel testified that he recalled the name "Mousy" Settles, and he said that Settles was an important witness. He said that he did not recall ever being shown Settles' polygraph reports. Counsel testified that the witness who found the body was important because there was an issue as to the color of the rope that was used in the crime. He agreed that Darryl Dobbins was also an important individual in that, at trial, Counsel raised the issue of Dobbins as a chief suspect who was seen outside of the victim's apartment.

Counsel testified that he was surprised that the trial judge reversed his decision about the admissibility of Wright's taped statement after the trial judge had a discussion with a Court of Criminal Appeals judge. He said that the trial judge did not notify him that he was going to seek the opinion of another judge, and he was not present for that discussion. He testified that he later learned that judges consulting with other judges was allowed, but he agreed that he did not raise the issue in the Petitioner's direct appeal.

On cross-examination, Counsel testified that he investigated this case as best as he could, and the Petitioner cooperated with him in the investigation. He said that he did not recall the Petitioner taking issue with the jury selection, and it is his practice to invite his clients to participate in the jury selection process. He said that, in this case, the Petitioner's father was involved, and either the Petitioner or his father could have directed him to exercise a peremptory challenge. Counsel said that, with regard to the tape recordings of other witnesses, there was nothing that he believed was significant, and Wright was not a witness that he could question because he never testified. Counsel testified that the tape-recordings did not have Wright on them, so he could not have used them. He said that the witnesses on the tape recordings did not refuse to testify, and he said that a strategy at trial was to attack the credibility of those witnesses.

Counsel testified that, at trial, he tried to establish that other people had the opportunity to commit this murder because there had been a lot of people "in and out" of the victim's apartment. He said another important aspect of the Petitioner's defense was the time of the victim's death and the Petitioner's alibi defense. Counsel testified that he could not remember the specific details, but

he recalled that the pathologist's testimony was not a surprise. He agreed that having the State pathologist testify that the time of the victim's death was no more than seventy-two hours prior to the discovery of the body was important to the Petitioner's defense, because the Petitioner's alibi would have been supported by such evidence. Counsel said he thought the pathologist's testimony went well because the State tried to rehabilitate the witness. He did not recall discussing with the Petitioner or the Petitioner's father the possibility of hiring a private pathologist or requesting a court-appointed pathologist, and he did not believe that it was necessary to do so. He said, at that time, it was uncommon to hire a court-approved pathologist. Counsel agreed that having the State's witness give testimony favorable to a defendant can be more powerful than such testimony from a defense witness. He said that the only thing he could think of that might have changed the outcome of the trial was more development of the issue of Darryl Dobbins in front of the jury. Counsel said that he did not remember if he knew Dobbins' name before trial, but he said that he certainly did not know the significance of Dobbins' testimony. He agreed that this was a hard-fought and close case, based on his perceptions of the testimony and the reactions of the jury. Counsel testified that he did not tell the Petitioner that he had to testify, but he probably recommended it, even with the Petitioner's prior criminal record, because of the co-defendant's testimony against the Petitioner.

Based upon this evidence, the post-conviction court issued an order denying the Petitioner's petition for post-conviction relief, and the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that: (1) that the State withheld exculpatory information from him; (2) the State committed prosecutorial misconduct in its closing arguments; (3) the trial court conducted an improper ex parte conference with an appellate court judge; (4) the trial court improperly instructed the jury; and (5) he received ineffective assistance counsel.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103 (2003). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by a preponderance of the evidence. McBee v. State, 655 S.W.2d 191, 195 (Tenn. Crim. App. 1983).[2] A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457.

---

[2] Since this petition was filed prior to May 10, 1995, it is governed by Tennessee Code Annotated section 40-30-101 et seq. (repealed 1995), rather than the Post-Conviction Procedure Act (Tenn. Code Ann. 40-30-101 et seq. (2003)). Under the current statute, the standard is "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2003).

## A. Exculpatory Evidence

The Petitioner contends that the State withheld exculpatory evidence from him. Specifically, he asserts that State failed to disclose the following evidence: (1) audiotapes of the interviews of witnesses conducted by ADA Jennings; (2) a polygraph report; and (3) the statements given to police officers by Darryl Dobbins and Patricia Byers.

Initially, we note that the Petitioner's allegations of the State withholding exculpatory evidence from him, if proved to be true, would provide an appropriate ground for post-conviction relief. See State v. Bowers, 77 S.W.3d 776 (Tenn. Crim. App. 2001). In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court established the prosecution's duty to furnish the accused with exculpatory evidence upon request by the defense. Id. at 87. Exculpatory evidence was defined as pertaining to the guilt or innocence of the accused and/or the punishment that may be imposed if the charge results in a conviction. State v. Marshall, 845 S.W.2d 228, 232 (Tenn. Crim. App. 1992); see Bates v. State, 973 S.W.2d 615, 638 (Tenn. Crim. App. 1997). Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. The duty to disclose exculpatory evidence extends to all "favorable information" irrespective of whether the evidence is admissible at trial. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). "Favorable information" includes evidence that could be used to impeach the State's witnesses. Id. 55-56 (citations omitted). While Brady does not require the state to investigate for the defendant, it does burden the prosecution with the responsibility of disclosing statements of witnesses favorable to the defense. State v. Reynolds, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984). However, this duty does not extend to information that the defense already possesses, or is able to obtain, or to information not in the possession or control of the prosecution or another governmental agency. Marshall, 845 S.W.2d at 233. Under Brady, the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police. Kyles v. Whitley, 514 U.S. 419, 437 (1995).

In order to establish a due process violation under Brady v. Maryland, a defendant must demonstrate the following:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
> 2. The State must have suppressed the information;
> 3. The information must have been favorable to the accused; and
> 4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). This Court has clarified that, with respect to the first element, the issue is whether the evidence, *when viewed by the prosecution*, is obviously exculpatory. State v. Spurlock, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993) (citations omitted) (emphasis added). In order to establish that exculpatory evidence is "material," a petitioner must

show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995); see also Edgin, 902 S.W.2d at 390. There must be a "'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Edgin, 902 S.W.2d at 390 (quoting Kyles, 514 U.S. at 435). The appropriate standard of materiality is not determined by its effect upon the defense's ability to prepare for trial but, instead, relates to the issues of guilt or innocence:

> [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, the additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

United States v. Agurs, 427 U.S. 97, 112-13 (1976). The Petitioner bears the burden of proving a Brady violation by a preponderance of the evidence. Id.

Initially, we note that the Petitioner has not made the trial transcript part of the appellate record. It is the duty of the appellant to prepare a complete and accurate record on appeal. Tenn. R. App. P. 24(b). Thus, the failure to include the trial transcript could result in a waiver of the issues that require the trial record in order to be determined. See Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). However, we may take judicial notice of the record in the Petitioner's direct appeal since it is filed with the clerk of this Court. See Edward Drummer v. State, No. W2000-00414-CCA-R3-PC, 2001 WL 1011592, at *1 n.3 (Tenn. Crim. App., at Jackson, Aug. 29, 2001), *perm. app. denied* (Tenn. Dec. 31, 2001). In this case, we choose to take judicial notice of the record pertaining to the Petitioner's direct appeal, and we will thus discuss the issues presented on their merits.

### 1. Taped Interviews

The Petitioner asserts that the State should have disclosed to him the tape-recordings of ADA Jennings' interviews with Wendy Rice, Julie Robbins Johnson, and Melissa Robbins. The State counters that the information contained in the tape-recordings is not obviously exculpatory and, because the defense did not request the information, the State had no obligation to disclose it.

### a. Wendy Rice

We first address whether the Petitioner has met his burden of showing a Brady violation with respect to the tape-recorded interview of Wendy Rice. Because the record is not clear that the Petitioner requested this information, we must first decide whether this statement meets the first required element of a Brady violation by being "obviously exculpatory." As previously stated,

-11-

"exculpatory evidence" extends to all "favorable information" and "favorable information" includes evidence that could be used to impeach the State's witnesses. See Johnson, 38 S.W.3d 55-56. In Rice's interview with ADA Jennings, she said that one of the State's witnesses, Wright, told her that this murder was committed by a black male whose name started with an "L." This evidence is clearly not "obviously exculpatory" and is, in fact, unfavorable to the Petitioner because the Petitioner is a black male, whose name starts with an "L." We conclude that the Petitioner has not met his burden of establishing the first element of a Brady violation. Furthermore, he cannot establish the third element, which requires that this evidence be "favorable" to him. Accordingly, the Petitioner is not entitled to relief on this issue.

### b. Julie Robbins Johnson

We next address whether the Petitioner has met his burden of showing a Brady violation with respect to the tape-recorded interview of Julie Robbins Johnson. Again we must determine whether the evidence about which the Petitioner complains is obviously exculpatory. In the interview, Johnson stated that Wright told her that the victim was an older woman, and Johnson could not determine exactly who Wright was talking about. The victim in this case was a man. This information is not "obviously exculpatory" and it is of little or no impeachment value. Moreover, the Petitioner has not proven that this information is "favorable" to him. Accordingly, we cannot conclude that he has established a Brady violation, and the Petitioner is not entitled to relief on this issue.

### c. Melissa Robbins

The Petitioner next complains that the State committed a Brady violation by failing to disclose to him the tape-recorded interview with Melissa Robbins, who was Wright's girlfriend and the mother of Wright's child. Prior to the Petitioner's trial, Wright had told ADA Jennings in a tape-recorded statement that the Petitioner committed this murder. However, at the Petitioner's trial, Wright refused to testify, invoking his Fifth Amendment rights, and the trial court admitted his tape-recorded statement to ADA Jennings for impeachment purposes only. The trial court instructed the jury that it was not to consider Wright's tape-recorded statement as substantive evidence, but it should only consider the statement for impeachment value.

In Robbins' tape-recorded statement to ADA Jennings, Robbins recalled a discussion with Wright about the murder. Robbins said that Wright told her that he knew who committed this crime, and he knew where the clothes were that the killer wore during the murder. She said that Wright told her that he was trying to get some reward money from this case. Robbins told ADA Jennings that Wright gave her vague clues about who the murderer was, such as "he goes away a lot and comes back." Robbins thought that there were multiple people who fit the clues given to her by Wright, and, at one point, she even wondered if Wright fit the description of the murderer. At the post-conviction hearing, ADA Jennings said that he believed that Robbins' testimony would be consistent with Wrights' testimony "that the [Petitioner] had admitted to killing [the victim]." He said that there was no indication that anyone other than the Petitioner committed this murder. ADA Jennings

did not believe that this interview contained exculpatory evidence.

The first element of a Brady violation is that the evidence be obviously exculpatory, and we conclude that Robbins' interview contained exculpatory evidence. First, Robbins' interview suggested that Wright had a bias in that he wanted reward money. More importantly, Robbins' interview showed that she suspected that Wright committed this murder. While this statement was extremely vague, it does implicate Wright in this crime. Moreover, the fact that Wright stated that he knew where the murderer's clothes were located also suggests that he may have been involved in the commission of this crime. Therefore, we conclude that the Petitioner has proven the first element of a Brady violation.

The Petitioner has also proven that this evidence was suppressed by the State. ADA Jennings had access to this information, and he did not give this information to the Petitioner. The third element of a Brady violation requires that the information be favorable to the Petitioner. As previously stated, information that is favorable to the accused may consist of evidence that "could exonerate the accused, corroborate[] the accused's position in asserting his innocence, or possess[] favorable information that would have enabled defense counsel to conduct further and possibly fruitful investigation regarding the fact that someone other than the appellant killed the victim." Marshall, 845 S.W.2d at 233. Our Supreme Court has articulated the standard for favorable evidence as, "Evidence is favorable to an accused where it exculpates the accused, mitigates the punishment, or impeaches the prosecution's witnesses." Sample v. State, 82 S.W.3d 267, 270 (Tenn. 2002). In other words, information is favorable if it "provides some significant aid to the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." Johnson, 38 S.W.3d at 56-57. In this case, the information meets this element of a Brady violation because it is favorable to the Petitioner. Robbins' statements show Wright's bias, and they seemingly implicate him in this murder. Accordingly, we next address whether this evidence is "material" such that its suppression violated due process.

In order to establish that exculpatory evidence is "material," a petitioner must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995); see also Edgin, 902 S.W.2d at 390. There must be a "'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Edgin, 902 S.W.2d at 390 (quoting Kyles, 514 U.S. at 435). The appropriate standard of materiality is not determined by its effect upon the defense's ability to prepare for trial but, instead, relates to the issues of guilt or innocence. We simply cannot conclude that this tape-recorded statement meets the fourth element of a Brady violation. Wright refused to testify at the Petitioner's trial, and, therefore, this evidence would have no impeachment value. Further, Robbins' vague reference that she, at one time, wondered if perhaps Wright fit the description of the murderer does not, in our view, create a reasonable probability that, had it been disclosed, the result of the proceedings would be different. We think that it is a better practice by the State to disclose interviews of this type, especially considering that, had Wright testified at trial as was the State's intention, our conclusion may have

-13-

been different. However, under the circumstances as they occurred at trial, we are constrained to conclude that the Petitioner has not shown all four elements of a Brady violation. He is, therefore, not entitled to relief on this issue.

## 2. Polygraph Report

Next, the Petitioner contends that a polygraph report that indicated that a witness, Michael Settles, was untruthful in his statements implicating the Petitioner should have been disclosed to the Petitioner. The State contends that the polygraph results would not have been admissible at trial, and therefore, the results would not have been useful to the Petitioner. The trial transcript reveals that Counsel knew that there were other polygraph examinations. It appears, however, that he was unaware of exactly which witnesses had been given polygraph examinations, and he was unaware what the result of those polygraph examinations were.

Michael Settles testified at the Petitioner's trial. Settles testified that he knew the Petitioner, and he had known him since May of 1986. He said that he also knew the victim, and he had been to the victim's apartment approximately three to four times. Settles explained that he had been to the victim's apartment with the Petitioner and a man named Johnny Thomas. When they got to the apartment, Thomas went into the apartment while Settles and the Petitioner waited for him in the car. He said that the three then left when Thomas returned to the car. Settles testified that he and some other friends went to the victim's apartment another time, after a spending a day on the lake. Settles said that, when he and his friends arrived at the victim's apartment, they went in and the victim gave them some money, which was not unusual. Settles said that, on May 8, 1986, which was approximately the day the victim was killed, he went to the victim's apartment with three other people. He said that they went in and "Tony" asked the victim for some money, and Settles could not recall whether the victim gave them any money. Settles testified that he left the victim's apartment and went back to his own house and, that evening, he was sitting on the porch when a black car pulled up in front of his house. He said that the Petitioner and a man named "Robinson" got out of the car, and there were two other people in the car, a blonde haired woman and an Asian American man. Settles said that, when the Petitioner got out of the car, he said "[t]hat he stabbed [the victim], or they stabbed [the victim]." Settles testified that he told the Petitioner that he wanted "nothing to do with it" and the Petitioner eventually left. A day or two later, the Petitioner called Settles and asked him if he had heard anything from the police, and then the Petitioner told Settles that the Petitioner was "going to get out of town." Settles conceded that he did not tell the police the truth the first, second or third time that he was interviewed because he did not want to be involved, but he eventually told them the truth, which was that the Petitioner said he stabbed the victim.

On cross-examination, Settles denied that he went to the victim's house to obtain marijuana. The following then occurred:

> Q. Okay. Now, I have three tape-recorded statements, and I assume I have got them all, but these were not the only times that you were interrogated by the police,

correct?
A. What, the three times –
Q. The three items that you were tape-recorded. You were interrogated on many other occasions, were you not?
A. I don't understand what you are saying.
Q. Okay. the police asked you a lot of questions –
A. Yes.
Q. – other than at these times when they put you on tape.
A. All I know is they picked me up five days in a row.

Settles was then questioned about how he remembered the specific date that the Petitioner came to his home, and he reiterated that he had gone on various occasions to the victim's house with other people. Settles said that there would be no reason to rob the victim because the victim would give you "anything he had" if you asked. The defense attorney then questioned him about specific individuals, asking if Settles had been to the victim's home with these individuals. Settles conceded that the police made it clear to him that he was a suspect in this murder because the "maintenance man said I was the last one seen leaving his house." Settles conceded that he, at first, told police that he never went to the victim's house the week that the victim was murdered, which was untrue.

Prior to the Petitioner's trial, on May 28, 1986, a polygraph examination was given to Settles, and the polygraph examiner detected an indication of deception to the following questions:

1. Did you deliberately lie when you said that [the Petitioner] said something about stabbing [the victim]?
2. In ref[]erence to what you said that [the Petitioner] said, are you deliberately lying about that?

Clearly, Settles answered no to these questions or the State would not have called Settles to testify. The fact that there was an indication of deceptiveness indicates that Settles could have been deliberately lying about his statements.

As previously stated, we must first decide whether the Petitioner proved that this information is obviously exculpatory to satisfy the first element of a Brady violation. We conclude that he has so proven. The polygraph examination indicated that Settles might have been untruthful about his statements that the Petitioner admitted stabbing the victim, and the State did not disclose this information to the defense. If Settles was, in fact, being untruthful when he stated that he was "not deliberately lying" about the Petitioner admitting stabbing the victim, this information is exculpatory. Even the implication that he may have been untruthful is exculpatory. This Court has previously held that a polygraph result was exculpatory even though not admissible. See State v. Bates, 973 S.W.2d 615, 639 (Tenn. Crim. App. 1997). In Bates, this Court concluded that, while exculpatory, the polygraph results were not material. Id. We cited Augers, for the proposition that "materiality is not determined by its effect upon the defense's ability to prepare for trial; instead, it relates to the issues of guilt or innocence." Id. (citing Augers, 427 U.S. at 112-13). We cannot conclude that there

is a reasonable probability that the results of the proceedings would be different had the Petitioner had this information. Counsel effectively impeached Settles by questioning him about lying to police three times before he provided them this story. Further, the polygraph results would not have been admitted by the trial court, and the jury would never have been able to hear those results. While we again note that it is a better practice for the State to disclose such results, under the circumstances presented by this case, we cannot conclude that this information was material. Therefore, the Petitioner is not entitled to relief on this issue.

### 3. Dobbins' and Byers' Statements

Finally, the Petitioner contends that the State withheld exculpatory information obtained by the police from two witnesses.

### a. Dobbins' Statement

First, the Petitioner argues that the State withheld a statement made by Darryl Dobbins to the Knoxville Police Department on May 15, 1986. In his statement, Dobbins indicated that he went with a group of people to the victim's apartment sometime around Wednesday, May 7, or May 9, 1986, but he could not specifically remember the date. He said that he knocked on the door, and the victim answered the door. Dobbins stated the following:

> [Investigator]: Did you kill [the victim]?
> DD: S***, no. Ain't no way I'd kill [the victim].
> [Investigator]: Know anybody that did?
> DD: The last time . . .
> [Investigator]: Do you have an idea who did it?
> DD: I can't think of . . . when I heard it, I was eating, and I ran to the t.v., and the first name popped in my mind was the neighbors because of what went on that night. Cause that's the last time we seen him. Wednesday. And they was, had a gun and they was cussing and saying . . . calling him queers and cussing us out, everything.

After throughly reviewing the trial transcript, we conclude that the Petitioner has not proven a Brady violation because it is clear that this statement was disclosed to his attorney prior to trial. At the Petitioner's trial, during the cross-examination of Terry Henry, who was an investigating officer, the Petitioner's attorney said "We know that you formally interviewed Darryl Dobbins, and I have got his statement, so I know that you did that one." Accordingly, there is clearly no Brady violation with respect to this statement.

### b. Byers' Statement

Second, the Petitioner contends that the State committed a Brady violation when it failed to provide the Petitioner with a statement from Patricia Byers. Specifically, the Petitioner argues that Byers' description of the man she saw outside the victim's apartment on May 11, 1986, and the

composite drawing made from this description, fit the description of Darryl Dobbins and not the Petitioner. Therefore, the Petitioner asserts that this information, and the drawing, should have been given to Counsel.

We conclude that the Petitioner has not met his burden of proving a Brady violation. The Petitioner did not present to the post-conviction court, or to this court, the composite drawing that he says is "obviously exculpatory." Without viewing the drawing, we cannot conclude whether it was of the Petitioner or of another suspect. Therefore, we cannot conclude whether it would exculpate or inculpate the Petitioner in this crime. As stated above, it is the Petitioner's duty to provide a full and complete record. Accordingly, the Petitioner is not entitled to relief on this issue.

### 4. Cumulative Effect

The Petitioner next asserts that the cumulative effect of these errors entitle him to post-conviction relief. We disagree. First, we have concluded that no Brady violations occurred. Next, we conclude that none of the evidence presented by the Petitioner at the post-conviction hearing shows that the results of the trial would have been different had he been aware of any of the information about which he complains. Therefore, while we think the State would be better served by disclosing this information, we do not conclude that the cumulative effect of its failure to do so entitled the Petitioner to the relief that he seeks.

### B. Waived Issues

The next three issues presented by the Petitioner are waived. The Petitioner contends that the State's closing argument was improper in two regards. The Petitioner alleges that the State's argument improperly credited the State's witnesses and that the State improperly argued that Counsel was attempting to mislead the jury. Next, the Petitioner contends that the trial court improperly communicated with an appellate judge and that, based on that communication, the trial judge allowed a tape-recorded interview to be admitted as evidence. Finally, the Petitioner alleges that the trial court erred in failing to instruct the jury on alibi.

The post-conviction court determined that these issues were waived. We agree. The Petitioner waives any issue by his failure to raise contemporaneous objections at trial. Tenn. R. App. P. 36(a); State v. Matthew Kirk McWhorter, No. M2003-01132-CCA-R3-CD, 2004 WL 1936389, at *41 (Tenn. Crim. App., at Nashville, Aug. 30, 2004), *no perm. app. filed*. Appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); see State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (holding that waiver applies when the defendant fails to make a contemporaneous objection).

A post-conviction court shall dismiss claims which have been waived. Tenn. Code Ann. §40-30-106(g) (2003). "A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent

jurisdiction in which the ground could have been presented," with certain exceptions not applicable in the present case. Tenn. Code Ann. §40-30-106(g). Because the issue of the trial court allegedly consulting with an appellate judge could have been raised on direct appeal, the issue is waived in this post-conviction proceeding pursuant to code section 40-30-106(g). Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

Further, we note that the Petitioner is not entitled to plain error review of this issue because "the plain error doctrine has no application in post-conviction relief proceedings." Corwyn E. Winfield v. State, 2003 WL 22922272, at \*5 (Tenn. Crim. App., at Jackson, Dec. 10, 2003), *perm. app. denied* (Tenn. May 10, 2004); see also State v. West, 19 S.W.3d 753, 756-57 (Tenn. 2000). We conclude, therefore, that these issues are waived.

### C. Ineffective Assistance of Counsel

The Petitioner claims that the post-conviction court erred when it dismissed his petition because Counsel failed to: (1) locate and interview a specific witness before trial; (2) present testimony from an independent forensic pathologist regarding the victim's time of death; (3) develop a theory of defense to the jury; (4) exercise peremptory challenges; (5) advise the Petitioner of his right not to testify at trial; (6) request a jury instruction on the defense of alibi; (7) contest the trial court's instruction on reasonable doubt; and (8) object to or raise on appeal the issue of an ex parte conference conducted by the trial court.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. State v. White, 114 S.W.3d 469, 475 (Tenn. 2003); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to a de novo review. Id.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge

the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citation omitted); Thomas Brandon Booker v. State, No. W2003-00961-CCA-R3-PC, 2004 WL 587644, at *4 (Tenn. Crim. App., at Jackson, Mar. 24, 2004), *perm. app. denied* (Tenn. June 21, 2004). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. House, 44 S.W.3d at 515.

### 1. Failing to Locate and Interview Patricia Byers

The Petitioner alleges that Counsel was ineffective by failing to sufficiently investigate the facts of this case. Specifically, the Petitioner contends that Counsel failed to locate and interview a witness, Patricia Byers, who lived across the hall from the victim. The State counters that the Petitioner has not proven that Counsel was ineffective, and he has not proven how not finding this witness prejudiced him. The post-conviction court found:

> [The] Petitioner . . . claims trial counsel was ineffective in failing to develop a witness (Patricia Byer, a.k.a. Vicki Williams) who questioned the validity of a composite drawing of the [Petitioner]. While there was evidence that this witness was not developed until after trial, the significance of this testimony pales in comparison to the inculpatory evidence and does not, in this court's view, undermine the confidence in the correctness of the verdict.

In order for a petitioner to establish prejudice from his attorney's failure to locate a witness, the petitioner must have this witness testify at the post-conviction hearing. Roy L. Sherrod v. State, No. 02C01-9806-CR-00164, 1999 WL 450237, at * 7 (Tenn. Crim. App., at Jackson, June 30, 1999), *no perm. app. filed*; see also Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). "It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a witness or what that witness' testimony might have been if introduced by defense counsel." Black, 794 S.W.2d at 757. The Petitioner did not call Byers to testify at the post-conviction hearing, and he did not obtain an affidavit from her stating how her testimony would have assisted the Petitioner. We, therefore, cannot speculate or guess as to what this witness' testimony might have been.

-19-

## 2. Failing to Obtain A Pathologist

The Petitioner contends that Counsel was ineffective by failing to obtain a forensic pathologist to establish the time of the victim's death. The State asserts that Counsel adequately cross-examined the State's pathologist and was effective in undermining the scientific basis that the State's pathologist gave for the estimated time of death of the victim. At the post-conviction hearing, Counsel testified that it was important to have the State's pathologist agree that the victim's death was no more than 72 hours before the body was found because the Petitioner had an alibi for the 72 hours preceding the time the body was found. Counsel testified that he did not think it was necessary to hire a private or court-appointed pathologist, and it was more powerful to elicit favorable testimony from the State's witness. After reviewing the evidence and the testimony of the Petitioner's forensic expert, Dr. Dunton, at the post-conviction hearing, the post-conviction court stated the following:

> Petitioner is particularly critical of . . . [C]ounsel's failure to call an expert to testify regarding the time of death of the victim, and presented expert testimony at the post-conviction trial on this issue. What [P]etitioner fails to acknowledge is that . . . [C]ounsel was able to establish through the testimony of the [S]tate's medical witness, Dr. John Evans that he felt the victim had been dead about three days when he examined him on May 15th, placing the date of death at or about May 12th. The [S]tate's unquestioned theory was that the assault causing this homicide occurred on May 8th. There was also undisputed proof that [the Petitioner] was in Canada on May 10th. This testimony by Dr. Evans, while not necessarily as strong as Dr. Dunton's, was essentially that same proof. Therefore, this court cannot find that [Counsel]'s decision to establish this fact through the testimony of the [S]tate's own witness and not elicit additional proof on that issue was ineffective assistance of counsel.

We conclude that the evidence does not preponderate against the post-conviction court's finding. The Petitioner claims that an independent forensic pathologist would have established the time of death of the victim. However, Dr. Evans and Dr. Dunton both testified that neither could determine the exact time of death of the victim, and Counsel was able to establish that Dr. Evans thought that the victim had been dead about three days. The Petitioner has not demonstrated how he was harmed by Counsel's failure to seek the services of an independent pathologist. See Henry Eugene Hodges v. State, No. M1999-00516-CCA-R3-PD, 2000 WL 1562865, at *17 (Tenn. Crim. App., at Nashville, Oct. 20, 2000), *perm. app. denied* (Tenn. March 26, 2001). The Petitioner is not entitled to relief on this issue.

## 3. Failing to Present A Theory of Defense to the Jury

The Petitioner contends that Counsel also failed to "coherently present a defense" and to "highlight material inconsistencies" presented by the State. Specifically, he contends that Counsel failed to address inconsistencies between the Petitioner's co-defendant's testimony and the testimony of other witnesses. The State asserts that the Petitioner has failed to show any deficiency in

Counsel's performance or that he was prejudiced by Counsel's performance. The post-conviction court addressed this issue in the context of Counsel's overall performance and stated:

> Simply put, while some things may have been presented differently on [the Petitioner's] behalf, this court cannot conclude that [Counsel] was ineffective in his representation of [the Petitioner], or that any of his alleged error would have resulted in a different outcome. There is no merit to [P]etitioner's allegations regarding ineffective assistance of counsel.

We conclude that the evidence does not preponderate against the post-conviction court's findings. Counsel attempted to establish an alibi for the Petitioner's whereabouts at the time that this murder occurred. He also attempted to undermine the State's witnesses by impeaching their testimony. In light of the very difficult set of facts presented by this case, we cannot conclude that the Petitioner has met his burden of showing that Counsel's performance was deficient. Further, he has not proven prejudice.

### 4. Failing to Exercise Peremptory Challenges

The Petitioner contends that Counsel was ineffective by not exhausting his peremptory challenges at trial. Specifically, the Petitioner alleges that three jurors served together on another jury that resulted in a conviction, and he requested that Counsel remove these jurors from participation in his trial. The State counters that the Petitioner has failed to show that any juror had a particular prejudice, and the Petitioner has not shown that the outcome of his trial would have differed with the participation of other persons as jurors. Further, the State asserts that Counsel's actions were appropriate, and the Petitioner has not shown prejudice. At the post-conviction hearing, Counsel recalled the jury selection process as follows:

> Q: [The Petitioner] has mentioned today for the first time something about the jury selection.
>
> A: Right.
>
> Q: Do you recall there being any issue at all with [the Petitioner] or the Court or in any form or fashion with the jury selection in this case?
>
> A: I don't remember any issue with him. I always invite clients to participate in that. Many of them don't want to, civil and criminal, because they just don't feel competent, but it's such an unscientific thing. [The Petitioner]'s father was involved too, and I communicated with him regularly. If either of them had wanted to talk to me about a peremptory challenge and wanted me to exercise one, and I had any, unless I thought there was some good reason for not doing it, I would do it.
>
> Q: And, again, the challenges that you exercise - - even if somebody that had sat on a previous case and been allowed to remain on this jury, that would have been a

strategic decision on your part?

A: Well, unfortunately, in criminal court that was pretty common back then, you know. The prosecutors had a book that told them every decision every juror had made and on - - in criminal court jurors hung around for a long time. In civil court they're there two weeks. You're lucky to get a juror who's ever tried a case.

Q: Right.

A: So it was not unusual to have jurors - - it was always preferable for the defense to have a new jury who hadn't heard too many and who hadn't convicted too many, but sometimes it was unavoidable.

The post-conviction court concluded that there was no merit to the Petitioner's claims, and we agree with the post-conviction's court determination. Our review of the record supports the post-conviction court's finding that Counsel's performance in this regard was within the range of competence demanded of attorneys in criminal cases. See Baxter, 523 S.W.2d at 936. There is no evidence that any juror had a particular prejudice toward the Petitioner. Furthermore, Petitioner has not shown that there is a reasonable probability that the result of his trial would have been different if Counsel had conducted voir dire differently. See Strickland, 466 U.S. at 694. Therefore, the Petitioner has not shown that he was prejudiced by Counsel's actions. The Petitioner is not entitled to relief on this issue.

### 5. Failing to Advise of Right to Not Testify

The Petitioner asserts that Counsel's representation was deficient because Counsel failed to properly advise him of his right not to testify. The State contends that the Petitioner has failed to show that Counsel was deficient or that the Petitioner was prejudiced. At the post-conviction hearing, the Petitioner testified:

Q: Did you recall [Counsel] ever discussing with you whether or not you had the right not to testify?

A: No. [Counsel] told me I had to or I would have been found guilty.

Q: Why did you not want to testify?

A: Because I had a previous conviction.

Counsel testified that he advised the Petitioner to testify, but asserted that the decision was ultimately the Petitioner's to make. At the post-conviction hearing, the following exchange took place:

THE COURT: [The Petitioner] also said, testified here today, that you told him that he had to testify, did not tell him he had an option not to testify. Do you remember

-22-

anything about that?

[COUNSEL]: Well, I wouldn't have done that. [The Petitioner], I think, had testified in a previous trial, and I thought he was capable of testifying, and I don't have a specific memory about he and I discussing the strategy of whether he should or shouldn't. I think we both just planned on him testifying, but if that had become an issue, I would have certainly told [the Petitioner] that he didn't have to testify or that he shouldn't if I thought he shouldn't.

He had some sort of record that we knew would have come into evidence but with the codefendant saying he saw him kill him and - - if he'd asked me should I testify or shouldn't I, I would have said, "Well, you know, if you don't testify, what's the jury going to think about the codefendant saying he stood there and watched you kill him, and he's going to jail for 35 years for it?" So I would have probably told him that I though the tradeoff in this case was probably worth it, that he should testify and risk the disclosure of his criminal record.

We conclude that the record does not preponderate against the post-conviction court's finding "that the [P]etitioner cannot prevail upon his claim of ineffective assistance of counsel." Although the Petitioner testified that Counsel did not inform him of his right to not testify, Counsel testified that he would not have said that to the Petitioner. Counsel stated that he did not recall a discussion with the Petitioner where he specifically explained the strategy of testifying or not testifying, however, Counsel testified that his strategy was for the Petitioner to testify because of the Petitioner's co-defendant's statements against the Petitioner. The decision that the Petitioner testify was a well-reasoned tactical decision, that was made to try to help the Petitioner overcome his co-defendant's testimony against him. Again, Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). We conclude, therefore, that the Petitioner is not entitled to relief on this issue.

### 6. Failing to Request A Jury Instruction on Alibi Defense

The Petitioner alleges that Counsel was ineffective because he failed to request an alibi instruction at trial. The Petitioner contends that "the prosecutor admitted that the State's proof would provide the Petitioner an alibi for May 10, 1986, through May 13, 1986, 'before the body was discovered.'" The State contends that the Petitioner's claim against Counsel is "ill founded and merit[s] no relief." Although the post-conviction court did not directly discuss the alibi defense jury instruction, it did determine:

After a thorough review of the trial record, evidence presented at the post-conviction hearings and arguments of counsel, it is this court's opinion that the [P]etitioner cannot prevail upon his claim of ineffective assistance of counsel. There was some evidence presented at trial by the [P]etitioner relative to his whereabouts at the time of the victim's death that tended to show his noninvolvement with the victim's

murder. Other evidence, however, clearly established his involvement and was obviously credited by the jury in reaching their verdict.

After a careful review of the post-conviction hearing, we agree with the post-conviction court. A trial court has the affirmative duty to instruct the jury on every issue raised by the proof, including the accused's theory of defense, such as alibi. Poe v. State, 370 S.W.2d 488, 491 (Tenn. 1963). The trial court must instruct the jury on the defense of alibi when it is "fairly raised" by the evidence. Manning v. State, 500 S.W.2d 913, 915 (Tenn. 1973). This duty exists irrespective of whether a request for the instruction by the defendant is made. Poe, 370 S.W.2d at 491. Alibi is fairly raised in the following instances: (1) where the defendant's alibi has been corroborated by other credible witnesses; (2) where the victim has been unable to identify the defendant; and (3) where the proof against the defendant is wholly circumstantial. Manning, 500 S.W.2d. at 916. The failure to charge the jury with the defense of alibi when it has been fairly raised by credible evidence is reversible error. Moffitt v. State, 29 S.W.3d 51, 57 (Tenn. Crim. App. 1999).

From our review of the record, we note that a major issue in this case was the time of death of the victim. The State argued that the victim died on or about May 8th, and the Petitioner and Counsel tried to establish that the victim died no more than thirty-six hours before the body was discovered, which was on May 14th. The Petitioner had proof that he left on a trip to Canada early on May 10th. The Petitioner has not meet his burden of proving that Counsel was ineffective for failing to request that the trial court give an alibi instruction. Counsel's decision not to object to the trial court not instructing the jury on the defense of alibi falls within the wide range of reasonable professional assistance because an alibi instruction was not borne out by the proof. See Burns, 6 S.W.2d at 462.

Moreover, even if we were to find that Counsel erred, the Petitioner has failed to show a reasonable probability that had Counsel requested an alibi instruction (assuming the trial court would have granted the request), the jury would have had reasonable doubt regarding the Petitioner's guilt. See Strickland, 466 U.S. at 695. There was ample evidence of the Petitioner's guilt. The Petitioner's accomplice, James Robinson testified in detail and stated that he saw the Petitioner stab the victim in the neck. Brown, 1990 WL 112370, at *1. Further, several witnesses testified that the Petitioner had admitted to them that he committed the murder. Id. at *2. In our view, the Petitioner has failed to show a reasonable probability of reasonable doubt "sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Therefore, the Petitioner has failed to satisfy the "prejudice prong" of Strickland. Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

### 7. Failing to Object to Reasonable Doubt Jury Instructions

The Petitioner next contends that Counsel was ineffective by failing to object to the trial court's instruction on reasonable doubt. In his brief, the Petitioner states that the jury was instructed as follows:

Reasonable doubt is that doubt engendered by an investigation of all the proof in the

case and an inability after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible, or imaginary doubt. In order to convict a defendant of any criminal charge, every element of proof required to constitute the offense must be proven to a moral certainty, but absolute certainty of guilt is not demanded by the law.

"The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." Victor v. Nebraska, 511 U.S. 1, 5 (1994). Furthermore, "so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, . . . The Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." Id. (citations omitted). In viewing the full context of the instruction, we conclude that the trial court's instruction of the definition of reasonable doubt "sufficiently described the degree of doubt necessary for acquittal and the degree of proof necessary for conviction." Pettyjohn v. State, 885 S.W.2d 364, 365 (Tenn. Crim. App. 1994). Further, it is well settled in this State that the challenged instruction on reasonable doubt containing the language "moral certainty" passes constitutional review. State v. Nichols, 877 S.W.2d 722, 734 (Tenn. 1994); see also Franklin E. Harris, Jr. v. State, No. 02C01-9701-CR-00003, 1998 WL 64004, at *1 (Tenn. Crim. App., at Jackson, Feb. 18, 1998), *perm. app. denied* (Tenn. Jan. 4 1999). Therefore, this issue is without merit.

### 8. Ex Parte Communication

The Petitioner contends that Counsel was ineffective by not objecting to or raising on direct appeal the issue of the trial judge consulting with an appellate judge about the admissibility of a tape-recorded interview with William Wright. The Petitioner, however, has failed to make appropriate reference to the record to support this contention. Under Rule 10(b) of the Rules of the Court of Criminal Appeals, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Accordingly, the Petitioner has waived his claim for relief as to this issue by failing to provide any references to the record in support of his argument. Additionally, the Petitioner failed to raise this issue on direct appeal, and it is therefore waived under Tennessee Code Annotated section 40-30-106(g). Accordingly, the Petitioner is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE